Joan M. ENNIS, Plaintiff–Appellant,

v.

The NATIONAL ASSOCIATION OF BUSINESS AND EDUCATIONAL RADIO, INCORPORATED, Defendant–Appellee.

No.. 94–1585.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 31, 1995.

Decided May 15, 1995.

**ARGUED:** John Michael Bredehoft, Charlson & Bredehoft, P.C., Reston, VA, for appellant. James Joseph Kelley, II, Morgan, Lewis & Bockius, Washington, DC, for appellee. **ON BRIEF:** Elaine C. Bredehoft, Linda G. Hill, Charlson & Bredehoft, P.C., Reston, VA, for appellant. Kevin P. McGlinchey, Morgan, Lewis & Bockius, Washington, DC, for appellee.

Before HAMILTON and LUTTIG, Circuit Judges, and BUTZNER, Senior Circuit Judge.

Affirmed by published opinion. Judge LUTTIG wrote the opinion, in which Judge HAMILTON and Senior Judge BUTZNER joined.

### OPINION

LUTTIG, Circuit Judge:

Appellant, Joan M. Ennis, appeals from an order of the United States District Court for the Eastern District of Virginia granting summary judgment in favor of appellee, the National Association of Business and Educational Radio ("NABER" or "the Association"), on Ennis' Americans with Disabilities Act ("ADA") claim. For the reasons that follow, we affirm.

### I.

In April 1990, NABER hired Joan Ennis as a bookkeeping clerk. At the time, Ennis was completing the admirable undertaking of adopting a child, Andrew Joshua or A.J., who was infected with the human immunodeficiency virus ("HIV"). A.J. remains asymptomatic to date. NABER's human resources manager knew of the adoption and encouraged Ennis to enroll A.J. in the Association's health plan. J.A. at 610–11.

NABER provides its customers with a service called "frequency coordination." When applications for frequency coordination are received, the mailroom sorts the checks or other payment information into groups of ten to twenty, and sends these "batches" to the bookkeeping section for entry; the application itself is sent to the data entry section for processing. Data entry clerks cannot process the application until bookkeeping records the payment information. Ennis' primary job function was to enter batches of check information into NABER's computer system.

NABER's management had numerous problems with Ennis' job performance. Memoranda to her personnel file document that supervisors repeatedly reprimanded Ennis about inaccuracies in data entry, excessive socializing, excessive personal phone calls, and tardiness. *See, e.g.,* J.A. at 94, 98–101, 105, 106–07, 122.

In the Fall of 1992, Leigh Veshosky, Ennis' immediate supervisor since August of that year, instructed Ennis that each day she must enter at least two of the current day's batches for each of NABER's five divisions, before leaving for the evening at 5:15 p.m. J.A. at 122; 641–42.

On January 28, 1993, Veshosky learned that the data entry section was left idle because only one batch from the previous day was entered. As a result, NABER suspended Ennis for two-and-one-half days. Veshosky recorded the event in a memorandum to Ennis' file that concluded, "[s]hould she violate her job duties at any time in the future her employment may at that time, without further discussion or notification, be terminated." J.A. at 122–23.

Ennis filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") approximately two weeks later. She alleged that the January suspension was prompted by NABER's desire to have Ennis leave the Association so as to avoid the possibly catastrophic impact of A.J.'s condition on NABER's insurance rates.

In June 1993, in preparation for Ennis' annual performance appraisal, Veshosky reviewed her records to find that on three occasions during a thirty-day period (May 5, May 28, and June 4, 1993), Ennis failed to enter the batches as required. Veshosky also learned from "every data entry area that there were regularly numerous errors in [Ennis'] data entry." J.A. at 138–39. Veshosky memorialized in Ennis' file that these "specific items *separately or together*" demonstrated an unacceptable level of performance and, therefore, that Ennis would be terminated. J.A. at 139.

Ennis brought the instant action under Title I of the ADA, alleging that NABER suspended and terminated her because of her known association with her disabled son, in violation of 42 U.S.C. § 12112(b)(4).[1] As she had averred before the EEOC, Ennis claims that NABER fired her to avoid the possibility of a catastrophic impact that A.J.'s illness might have caused on the Association's insurance rates. As evidence to support that alleged motive, Ennis proffers a memorandum from NABER's director of human resources to all employees, describing the Association's insurance coverage. The memorandum, dated December 29, 1992, notes that if the number of individuals electing coverage goes above fifty, premium increases will be based on the participant's actual expenses, rather than the current "pool" coverage; "[w]hat this translates to," the memo concludes, "is if we have a couple of very expensive cases, our rates could be more dramatically affected than they currently are." J.A. at 142. According to Ennis, this, and the fact that NABER's president recently had

"the first of the 'couple of very expensive cases,'" Appellant's Br. at 18, confirm that the Association fired her because of her relationship with a disabled person. NABER responded that Ennis' discharge was in no way related to her son's condition or its insurance coverage, but solely the consequence of her poor work performance. The Association moved for summary judgment. After a hearing, the district court granted the motion on April 1, 1994. The court found that the *McDonnell Douglas* framework is applicable to an ADA claim and that Ennis had established a *prima facie* case of discrimination, but that she failed to present evidence, sufficient to create a triable issue, that the legitimate, nondiscriminatory reason that NABER proffered to explain Ennis' discharge was a pretext for discrimination. J.A. at 699–704. Ennis now appeals.

## II.

### A.

■ Courts have applied the *McDonnell Douglas* scheme of proof to claims brought under several different statutes. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). In this case, we must decide whether the now familiar, burden-shifting framework is applicable to a claim brought under the ADA.

To the extent possible, we adjudicate ADA claims in a manner consistent with decisions interpreting the Rehabilitation Act. *See Doe v. University of Md. Medical Sys. Corp.*, 50 F.3d 1261, 1264 n. 9 (4th Cir.1995); *Tyndall v. National Educ. Ctrs.*, 31 F.3d 209, 213 n. 1 (4th Cir.1994); 42 U.S.C. § 12201(a). And, courts routinely have applied the *McDonnell Douglas* paradigm to Rehabilitation Act claims, at least in those circumstances where the defendant disavows any reliance on dis-

---

1. Ennis also asserted a state-law claim for wrongful termination of employment in violation of public policy. Va.Code § 2.1–714 *et seq.* The Virginia Human Rights Act, under which this claim was brought, "does not create any new causes of action," *Lockhart v. Commonwealth Educ. Sys. Corp.*, 247 Va. 98, 439 S.E.2d 328, 331 (1994), applying only where a violation of existing laws is found, *id.* Since we conclude that Ennis' ADA claim fails, her state-law claim necessarily fails.

criminatory reasons for its adverse employment action. *See, e.g., Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994); *Teahan v. Metro–No. Commuter R.R.,* 951 F.2d 511, 514 (2d Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 54, 121 L.Ed.2d 24 (1992); *Smith v. Barton,* 914 F.2d 1330, 1339–40 (9th Cir. 1990), *cert. denied,* 501 U.S. 1217, 111 S.Ct. 2825, 115 L.Ed.2d 995 (1991) (all holding that where an employer asserts that its adverse employment action against a disabled person was motivated by legitimate reasons unrelated to the disability, the *McDonnell Douglas* framework is apt). Accepting the framework's application to the Rehabilitation Act, and finding no reason to distinguish the two statutes in this regard, we hold that the *McDonnell Douglas* scheme of proof does apply to appropriate claims under the ADA.

■ Under the *McDonnell Douglas* proof scheme, the plaintiff has the initial burden of proving a *prima facie* case of discrimination by a preponderance of the evidence. If the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action. If the defendant meets this burden of production, the presumption created by the *prima facie* case "drops out of the picture," and the plaintiff bears the ultimate burden of proving that she has been the victim of intentional discrimination. *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, —— ——, 113 S.Ct. 2742, 2746–49, 125 L.Ed.2d 407 (1993) (holding that *prima facie* case plus disbelief of employer's asserted justification for employment action is not necessarily sufficient to establish violation; summary judgment appropriate unless plaintiff presents adequate evidence that employer unlawfully discriminated).

In general terms, a plaintiff establishes a *prima facie* case by proving a set of facts which would enable the fact-finder to conclude, in the absence of any further explanation, that it is more likely than not that the adverse employment action was the product of discrimination. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 577, 579–80, 98 S.Ct. 2943, 2949–50, 2951, 57 L.Ed.2d 957 (1978); *Mitchell v. Data Gen. Corp.,* 12 F.3d 1310, 1315 (4th Cir.1993); *Duke v. Uniroyal, Inc.,* 928 F.2d 1413, 1418 (4th Cir.), *cert. denied,* 502 U.S. 963, 112 S.Ct. 429, 116 L.Ed.2d 449 (1991). To assist in the practical application of the standard, we have on occasion specified more precisely the elements of the *prima facie* case, depending on the factual situation and claim alleged, *see McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. We now hold that in a typical discharge case brought under the ADA, a plaintiff must prove by a preponderance of the evidence that (1) she was in the protected class; (2) she was discharged; (3) at the time of the discharge, she was performing her job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination, *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *see also Crawford,* 37 F.3d at 1341; *Smith,* 914 F.2d at 1340. We believe this formulation of the final prong is preferable to those applied in other contexts [2] for two reasons. First, where disability, in contrast to race, age, or gender, is at issue, the plaintiff in many, if not most, cases will be unable to determine whether a replacement employee is within or without the protected class, that is, whether or not that person is disabled or associates with a disabled person. Under the Act, even the employer is generally forbidden from inquiring about the disability of an employee or prospective employee, *see* 42 U.S.C. § 12112(d). Second, even if the plaintiff could obtain such information, requiring a showing that the replacement was outside the protected class would lead to the dismissal of many legitimate disability discrimination claims, since most replacements would fall within the broad scope of the ADA's protected class—the enormous number of

---

2. In other discriminatory contexts, the plaintiff must show that the employer continued to seek applications from persons of similar qualifications, *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824, or that he was replaced by an individual with comparable qualifications outside the protected class, *Mitchell,* 12 F.3d at 1315.

Americans with disabilities, as defined by the Act, exponentially increased by those persons who are associated with individuals who are disabled, as so defined. Therefore, it is necessary to reformulate the fourth prong, as we did in *Holmes v. Bevilacqua*, 794 F.2d 142 (4th Cir.1986) (*en banc*), to require that the plaintiff present some other affirmative evidence that disability was a determining factor in the employer's decision. *See id.* at 147 (Title VII failure to promote claim). This formulation should not be interpreted as diminishing the plaintiff's burden in proving her *prima facie* case. While the burden is "not onerous," *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093, it is also not empty or perfunctory. Plaintiff's evidence must be such that, if the trier of fact finds it credible, and the employer remains silent, the plaintiff would be entitled to judgment as a matter of law. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094.[3]

Although we accept the *McDonnell Douglas* framework as a useful tool, it should not be applied in a "rigid, mechanized, or ritualistic" manner. *Furnco Constr.*, 438 U.S. at 577, 98 S.Ct. at 2949. The paradigm is merely a means to fine-tune the presentation of proof and, more importantly, to sharpen the focus on the ultimate question—whether the plaintiff successfully demonstrated that the defendant intentionally discriminated against her. *See St. Mary's Honor*, —— U.S. at ——, 113 S.Ct. at 2746; *United States Postal Serv. Bd. of Govs. v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); *Burdine*, 450 U.S. at 253, 255 n. 8, 101 S.Ct. at 1093, 1094 n. 8; *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511 (4th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 666, 130 L.Ed.2d 600 (1994).

### B.

Applying this scheme of proof to Ennis' ADA claim, we consider whether Ennis established a *prima facie* case of discrimination and, specifically, whether she proved that she was a member of the protected class, that her job performance was adequate, and that the circumstances support a reasonable inference that NABER unlawfully discharged her because of A.J.'s HIV-positive status.

### 1.

NABER argues that the district court erred in finding that Ennis was a member of the protected class. The appellant sought protection of the ADA not as a "qualified individual with a disability," but under section 102(b)(4) of the Act, which prohibits employers from taking adverse employment action "because of the known disability of a person with whom the qualified individual is known to have a relationship or association." 42 U.S.C. § 12112(b)(4); *see Tyndall*, 31 F.3d at 214. NABER contends that Ennis failed to establish either that HIV-positive status is a disability under the statute or that A.J.'s condition was "known" to the employer.

The ADA states that,

The term "disability" means, with respect to an individual—

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). We believe that the plain language of the provision requires that a finding of disability be made on an individually-individual basis. The term "disability" is specifically defined, for each of subparts (A), (B), and (C), "with respect to [the] individual" and the individualized focus is reinforced by the requirement that the underlying impairment substantially limit a major life activity *of the individual.*[4] *See*

---

3. It is evident that the district court erred in its articulation of the paradigm's fourth prong, whether the prong is as we now articulate it or whether the plaintiff is required to show that she was replaced by someone outside the protected class. The district court framed the element as, that the employer filled the position with a person it believed was outside the protected class.

J.A. at 702. The court thought that "it's the defendant's perception that's important" and that the fourth prong could be satisfied if employers "think they're hiring somebody who is not disabled or associated with somebody who is disabled." J.A. at 702.

4. The EEOC, under its charge to issue regulations to carry out Title I of the ADA, *see* 42 U.S.C.

*Forrisi v. Bowen,* 794 F.2d 931, 933 (4th Cir.1986) (addressing virtually identical provision in Rehabilitation Act and concluding that "[t]he question of who is a handicapped person under the Act is best suited to a 'case-by-case' determination") (citation omitted); *United States v. Southern Management Corp.,* 955 F.2d 914, 918 (4th Cir.1992) (under nearly identical language in Fair Housing Act, "[w]hether or not a particular person is handicapped is usually an individualized inquiry") (citing *Forrisi*); *Byrne v. Board of Educ.,* 979 F.2d 560, 564–65 (7th Cir.1992) ("The first issue ... is whether [the physical impairment] is a 'substantial limitation' of a 'major life activity,' as the statutory definition ... requires. The statute's inclusion of the limiting adjectives 'substantial' and 'major' emphasizes that the impairment must be a significant one.... Whether or not a person is handicapped under the [Rehabilitation] Act is an individualized inquiry, best suited to a case-by-case determination.") (citations omitted); *Welsh v. City of Tulsa,* 977 F.2d 1415, 1417 (10th Cir.1992) ("The question of who is a handicapped person under the [Rehabilitation] Act is decided on a case-by-case basis. The definition of a handicapped person has two elements: first, that one has, has a record of having, or is regarded as having a physical or mental impairment; and second, that that impairment substantially limits one or more major life activities.") (citation omitted); *Chandler v. City of Dallas,* 2 F.3d 1385, 1396 (5th Cir.1993) (noting need for individualized inquiry and recognizing that "the effect of a given type of impairment ... can vary widely from individual to individual"), *cert. denied,* —— U.S. ——, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994). There is no evidence in the record before us that A.J. is impaired, to any degree, or that he currently endures any limitation, much less a substantial limitation, on any major life activity. His mother has candidly admitted that her son suffers no ailments or conditions that affect the manner in which he lives on a daily basis. J.A. at 544. And there is no evidence that A.J. has a record of, or has been regarded as having, an impairment that substantially limits a major life function. Were we to hold that A.J. was disabled under the ADA, therefore, we would have to conclude that HIV-positive status is *per se* a disability. The plain language of the statute, which contemplates case-by-case determinations of whether a given impairment substantially limits a major life activity, whether an individual has a record of such a substantially limiting impairment, or whether an individual is being perceived as having such a substantially limiting impairment, simply would not permit this a conclusion. However, because the record as to any limitations on A.J.'s major life functions, or perceptions of any such limitations, may be less than fully developed at this stage of the litigation, we will assume for the purposes of this case that A.J. was disabled under the Act.

On whether NABER's management *knew* that A.J. was HIV-positive, the evidence is conflicting. NABER's president, vice president, director of human resources, and manager testified that they did not know that A.J. was HIV-positive, at least prior to the filing of the EEOC charge. J.A. at 589–90, 614, 598–600, 654. Certain individuals explained that they knew that A.J. was a "special needs" child, but did not know the nature of the child's affliction. J.A. at 598–99. The appellant, on the other hand, testified that, when she was hired, she told the director of human resources that A.J.'s mother had AIDS and, furthermore, her son's status was a "known fact" around the Association. J.A. at 242–43; 577–78. While we believe that in many cases the relevant decisionmakers will not know of an employee's relationship or association with a disabled person, in this instance, we agree with the district court

---

§ 12116, has defined "physical or mental impairment" to include "[a]ny physiological disorder, or condition, ... affecting one or more of the following systems: reproductive ... hemic and lymphatic." 29 C.F.R. § 1630.2(h)(1). Although uncertain of the EEOC's authority to promulgate this regulation, since it interprets a term which does not appear in Title I (the specified extent of the EEOC's regulatory authority), we do not understand this regulation to be in conflict with the above conclusion. This regulation does not eliminate (nor could it) the statutory requirement that the physical or mental impairment substantially limit a major life activity of *the particular individual.*

that the evidence presented, although a slender reed, is sufficient to create a triable issue on whether NABER knew the nature of A.J.'s condition. Therefore, the district court did not err in finding that Ennis had provided sufficient evidence regarding her membership in the protected class to withstand summary judgment.

### 2.

■ Next, NABER argues that Ennis failed to show that she was performing her job at a level that met NABER's legitimate expectations. The district court, although recognizing that it was a "close issue," concluded without explanation that Ennis had presented evidence sufficient to create a triable issue on this element of the *prima facie* case. J.A. at 701. We cannot agree with the district court on this score.

Undisputed evidence in the record shows that NABER was not satisfied with Ennis' job performance. Annual performance evaluations and internal memoranda document that Ennis' supervisors warned her about excessive socializing and personal phone calls, inaccuracies in her data entry and filing, and tardiness. J.A. at 94, 98–101, 105, 106–07, 125–27. For instance, a memorandum to Ennis' personnel file memorializes an October 31, 1991, meeting at which a supervisor explained to Ennis that NABER was relocating her desk because of her "disruptive" behavior and that this constituted an "unacceptable level of performance." J.A. at 105. Ennis received a reprimand in October 1992 about spending too much time on the phone handling personal matters and too many data entry errors; she was warned in writing that "this was a very serious problem" and should the problem persist, disciplinary action, including suspension or termination, would take place. J.A. at 106–07. The reports show that during Ennis' tenure at NABER, the problems increased and her performance deteriorated. Ennis' performance ratings, in particular, demonstrate the trend: she received a rating of "Good" in October 1990, "Achieved" in July 1991, and "Improvement Needed" in her final appraisal in July 1992. J.A. at 88–90. In fact, Ennis' own attorney conceded at the hearing before the district court that Ennis "was not a model employee. She talked too much. She made too many phone calls." J.A. at 681.

Ennis was suspended for two-and-one-half days beginning January 28, 1993, after Veshosky learned that Ennis failed to fulfill her quota of entering two batches from each of NABER's areas. J.A. at 122. Veshosky prepared a memorandum, detailing the basis for the suspension and reiterating Ennis' obligation "to obtain the current days work in the afternoon for the expressed purpose of entering batches for each data entry area so that [the data entry clerks] are able to work productively when they are in the next day." J.A. at 122. The memorandum concluded: "Should [Ennis] violate company policy or fail to perform her job duties at any time in the future her employment may at that time, without further discussion, be terminated." J.A. at 123. On February 9, 1993, Veshosky and Ennis conducted their quarterly performing planning session; the meeting was memorialized in a writing that Ennis signed:

> We reinforced the procedure … relating to Joan's responsibility to obtain the cash batches from the mailroom each afternoon at approximately 3:00 to 3:30 pm in order to enter a couple of the current day's batches at the end of each day for all data entry groups…. We also discussed during the quarter and again during our meetings that the cash batch entry is Joan's *PRIMARY* responsibility.

J.A. at 128. The requirement was once again presented in May 1993. J.A. at 131–32. Ennis admits that she repeatedly did not meet that obligation. This failure, plus her unacceptable performance in data entry, led NABER to fire Ennis on June 8, 1993. J.A. at 138–39.

Ennis attempts to ignore or dismiss the substantial evidence documenting her chronic poor job performance by focusing only on the three specified dates on which she failed to enter the requisite batches, and arguing that these incidents in isolation are not credible justification for her dismissal. Ennis is mistaken, first, in suggesting that NABER fired her solely because of her deficiency on those dates; the memorandum on her termination states that her failure to enter the batches on

**62**

the specified dates "separately or together" with her unacceptable data entry errors were grounds for her discharge, J.A. at 139 ("every data entry area [indicated] that there were regularly numerous errors in [Ennis'] data entry"). She is also wrong in thinking that the allegations about her poor performance are "irrelevant" to the case before us. *See* Appellant's Br. at 7. This evidence directly informs the third element of the *prima facie* case.

Indeed, we conclude that the evidence of Ennis' poor performance was so substantial and persuasive that no reasonable jury could find by a preponderance of the evidence that she was performing her job adequately. The district court thus clearly erred in finding that Ennis had proven this element of her case, and in not entering summary judgment against the appellant on that basis.

### 3.

Ennis is also unable to establish the fourth prong of the *prima facie* case—that the discharge occurred under circumstances that would permit an inference of discrimination on the basis of an impermissible factor. Nothing from the record links Ennis' discharge to her son's HIV-positive status. The December 1992 memorandum on NABER's insurance coverage is too remote and too tenuous to create a genuine issue of material fact. The trier of fact would have to infer from an innocuous notice informing employees about their insurance, that NABER wanted to prevent its employees from filing expensive claims against its insurance, that NABER knew Ennis' son was HIV-positive and would incur substantial medical expenses, and that NABER decided to fire Ennis as a direct result. The building of one inference upon another will not create a genuine issue of material fact. *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). Mere unsupported speculation, such as this, is not enough to defeat a summary judgment motion. *Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987); *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985) ("Genuineness means that the evidence must create a fair doubt; wholly speculative assertions will not suffice."). At

bottom, Ennis imputes to NABER discriminatory motive, without factual support. Although courts must carefully consider summary judgment when intent is an issue, *id.* at 364–65, "[t]he summary judgment rule would be rendered sterile ... if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion." *Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985). Since Ennis cannot point to any circumstance surrounding her discharge that credibly raises an inference of unlawful discrimination, she failed to make an adequate showing on an essential element of her case.

In sum, the evidence presented was not sufficient for a rational trier of fact to find that Ennis was performing her job at a level that met NABER's legitimate expectations or that the circumstances of her discharge indicate that NABER discriminated on the basis of A.J.'s condition. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–51, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986). Therefore, the district court should have found that Ennis failed to establish a *prima facie* case of discrimination and granted summary judgment on this basis, precluding the need even to reach the question of pretext.

*AFFIRMED.*