William J. FAIX, Plaintiff,

v.

MOEN, INC., Defendant.

No. 4:95–CIV–46–BO(1).

United States District Court,
E.D. North Carolina,
Eastern Division.

Aug. 8, 1996.

David P. Voerman, Voerman & Carroll, New Bern, NC, for plaintiff.

A. Bruce Clarke, Ogletree, Deakins, Nash, Smoak & Stewart, Raleigh, NC, for defendant.

## *ORDER*

TERRENCE WILLIAM BOYLE, District Judge.

Plaintiff William J. Faix has brought this action against his former employer, defendant Moen, Inc., alleging that he was terminated from his job as a Quality Control Manager at Moen's New Bern, North Carolina plant in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* This matter comes before the Court on plaintiff's motion to re-open discov-

ery, and defendant's motion for summary judgment.

\* \* \* \* \* \*

*The Motion to Re–Open Discovery*

On December 29, 1995, plaintiff filed a motion to compel discovery and a motion to extend discovery through February 29, 1996. The motion to extend discovery was granted on January 5, 1996. The motion to compel was denied on January 26, 1996, as the Court found that defendant had complied in full with the requests for discovery at issue.

The plaintiff now seeks to re-open discovery, claiming that certain information was revealed for the first time at a deposition of a defense witness on March 7. The Court believes, however, that this same information was contained in an exhibit provided plaintiff at his deposition on September 27, 1995. The motion to re-open discovery is therefore DENIED.

*The Motion for Summary Judgment*

Summary judgment shall be granted when, viewing the facts in the light most favorable to the non-moving party, (1) there is no genuine issue of material fact, and (2) the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ. P.Rule 56(c). The party bearing the burden of proof on an issue at trial must "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (citation omitted). Factual disputes whose resolution would not affect the outcome of the suit are irrelevant to the consideration of a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

I.

In July, 1984, at the age of 44, plaintiff was hired by defendant as Manager of Quality Control at the defendant's plant in New Bern, North Carolina. As Manager of Quality Control, plaintiff was directly responsible for the quality of the plant's production and packaging of bathroom and kitchen faucets and tub spouts.

Through the course of plaintiff's employment, the New Bern plant experienced remarkable growth. Daily production had grown from approximately 500 to 23,000 faucet sets daily from 1984 through 1993. In 1992, the plant had employed approximately 350 employees, a number which now stands at approximately 1000. With growth, however, came quality control problems. Plaintiff has testified that 1993 saw a 400% increase in "quality holds" requiring repairs on products prior to shipment, a level he agreed was unacceptable in an area for which he has admitted responsibility. Supplier inventory, another area of plaintiff's responsibility, experienced similar problems.

Richard Kosco, the plant's manager and the man to whom plaintiff answered, blamed these problems on plaintiff's "lack of discipline and emphasis on quality." Plaintiff apparently took little or no action to correct the quality control problems, missed important deadlines, and did not implement quality-related policies and directives. This included a failure, despite many requests, to institute a program designed to convey to employees the company's quality standards, and a failure to meet corporate-mandated deadlines for the establishment of a cosmetic review board and for shipping cosmetic samples to vendors.

Plaintiff blamed the quality control problems on defendant's unreasonable introduction of a new product line, "Monticello." This new line of faucets was allegedly plagued by "chronic problems" with suppliers and inherent engineering problems that had not been adequately worked out ahead of production due to the unrealistically aggressive launch schedule of six months, as opposed to the standard eighteen month schedule for the introduction of a new product line. Plaintiff claims that the uncontrollable quality problems owing to the Monticello introduction eventually claimed Mr. Kosco's job as well, asserting that the plant manager's early retirement was forced.

Plaintiff readily conceded that the quality problems placed the plant's management under "extreme pressure" from corporate officials distressed at the plant's quality control related cost overruns. Kosco was called to

visit the corporate headquarters in Elyria, Ohio, to discuss plaintiff's performance with Jim Jones, Corporate Director of Manufacturing, Jim McGrath, Vice President of Quality Control, and Don Bireley, Vice President of Human Resources. Bireley directed Kosco and McGrath to draft written assessments of plaintiff's work and recommend whether or not plaintiff should be replaced.

McGrath sent his memorandum to Kosco and Bireley on August 2, 1993. That memorandum is highly critical of plaintiff's performance, and includes "some of the incidents that have convinced me you need a more effective QC Manager to install the changes needed to improve your plant." Regarding the cosmetic review board: "[Plaintiff] has treated this whole effort with disinterest and disdain from the beginning." As for the manner in which open quality control hold inventory is maintained:

> New Bern produced *ONE* report and is the only plant not turning in monthly reports. This has necessitated multiple trips by the Purchasing Department personnel to attempt to quantify and identify the problems ... an inventory of open QC holds was taken that resulted in writing off $166M—including a whole truckload of material held in the yard from a vendor that was dropped over a year ago ... Purchasing ... asked that New Bern inventory all material in the QC hold area. The total came to $193,000 but only included material actually behind the fenced wall. Two to three times as much held material sits in front of the fence and was not counted.

> [Plaintiff] has 18 out of 23 QC personnel and a supervisor devoted to incoming inspection—to the near exclusion of what is going on in Assembly—and it is totally out of control and ties up several hundred thousand dollars of inventory.

> I have told [plaintiff] more than once that his manning distribution is backwards. Eighteen people inspecting incoming material seems to be accomplishing very little, while five people on the assembly floor are struggling to control a 400% increase in outgoing Quality Holds found by Reliability and customer complaints.

McGrath further describes a "particularly embarrassing and unnecessary situation" regarding the return to a supplier of seven shipments of allegedly defective parts. The defective parts were initially sorted into three separate types of defects, of which only one would be charged back to the supplier, but were then intermixed and charged back entirely to that supplier. It later turned out "that 72% of all of the seven 'rejected' shipments were in fact good!"

The McGrath memo continues at length to describe, with obvious frustration, plaintiff's shortcomings as Manager of Quality Control. "The bottom line is that there are insufficient QC procedures in place, the manpower is improperly distributed, not communicated to and there appears to be no plans [sic] to change anything. I have no confidence in [plaintiff's] approach. In my opinion, your plant desperately needs new QC leadership." Kosco's memorandum reached the same conclusion: "I feel a change in Q.C. leadership is necessary in order for New Bern to get control of quality problems. It is my recommendation to remove [plaintiff] from this position and bring in 'new blood' to revitalize quality at New Bern."

The recommendation to remove plaintiff from his position was accepted. On August 26, 1993, Kosco informed plaintiff that he would no longer hold the position of quality control manager. Plaintiff was offered a new position of Reliability Lab Manager that would be created with the completion of a new addition to the plant. Until then, however, plaintiff would be assigned special projects. Plaintiff was given the rest of the week off from work to explore whether he wanted to accept the demotion.

On August 30, 1993, Kosco assigned plaintiff the special projects he would be working on until the creation of his new position. Plaintiff understood the importance of these projects, and consequently the need to complete them within the allotted time. On September 1, 1993, Mark Ball became Corporate Director of Quality Assurance, a position in which he reported directly to McGrath. McGrath assigned Ball to supervise plaintiff's work directly, taking charge of the special projects. On September 9, 1993, Ball issued

McGrath and Kosco a prioritized list better defining the projects, which Kosco then reviewed with plaintiff. Most projects had completion target dates on or before September 30. When Ball met with plaintiff on September 30 to review the projects, plaintiff claimed they had all been 100% completed. Ball disagreed, and outlined the areas where he felt plaintiff's performance had fallen short. Plaintiff was then given until November 1 to complete the projects.[1]

On November 3, Ball again met with the plaintiff, and found that four of the five assigned projects were incomplete. Plaintiff was reminded that if the projects were not properly completed, he would not get the new job. He was further told that no change could be discerned in the status of the projects since the previous review on September 30, and that this was totally unacceptable.

The following day, Ball met with plaintiff and gave him a memo memorializing the history of their meetings and the special projects. The memo granted plaintiff a final extension for the completion of his projects. If the work would not be completed by November 15, plaintiff would not be offered the new position. Plaintiff told Ball that he might have a difficult time completing the work by November 15, as he had long been scheduled to take a vacation the following week. Ball told plaintiff, "You have to decide what's more important, your job or your vacation." Plaintiff took the vacation at his farm in Jones County to hunt with visiting family members.

On November 15, plaintiff provided Ball with a memo described by the latter as "just more verbiage." Plaintiff admitted the requested work was not completed. The two met again on November 18, where plaintiff was given one more day to complete the assignments. The assignments were not properly done, and so on November 19, 1993, the decision was made to terminate plaintiff for cause, effective immediately.

Ball recorded the events surrounding plaintiff's dismissal in an employee log memorandum. In that document, Ball commented:

It was very frustrating to me that no matter what I said or did nothing seemed to change ... What he submitted initially to Dick Kosco never changed much in subsequent reviews of the projects ... As time went on I came to realize that [plaintiff] was just going through the motions and with out really trying to complete the tasks as outlined.

The tasks outlined were very fundamental, entry level tasks for a new Quality Technician. These tasks were certainly well within the grasp of a person with [plaintiff's] quality experience.

At the time of plaintiff's demotion, he was 53 years old and receiving a salary of $58,-000. His replacement was 33 years old, and was compensated with $54,000. The woman who eventually became the Reliability Lab Manager is believed to be in her thirties.

Plaintiff filed his charge with the EEOC on May 18, 1994, and this complaint on May 9, 1995.

## II.

■ The question of whether plaintiff was improperly demoted in violation of the ADEA is not properly before the Court. The right to bring a civil action under the ADEA arises only once sixty days have passed from the filing of a proper charge before the EEOC. The law requires that a charge forming the basis for an ADEA action must be filed "[w]ithin 180 days after the alleged unlawful practice occurred." 29 U.S.C. § 626(d)(1).

■ The EEOC charge in this case was filed 180 days following plaintiff's termination, but almost nine months following his demotion. Only the termination claim is therefore before the Court. Plaintiff maintains that the initial demotion was part of a continuous series of acts, and that the statute must therefore run only from the date of his termination. This argument must be rejected. Where it is recognized, the exceedingly narrow equitable doctrine allowing courts to consider the entirety of a "continuing violation" with roots beyond the statutory period is reserved for "[w]here the unlawful employ-

---

1. Plaintiff was also required to attend a training program for the new position as Reliability Lab Manager, which he completed by early November.

ment practice manifests itself over time, rather than as a series of discrete acts." *Waltman v. International Paper Co.*, 875 F.2d 468, 474 (5th Cir.1989), *quoting Abrams v. Baylor College of Medicine*, 805 F.2d 528, 532 (5th Cir.1986). Plaintiff's demotion was a discrete act, and it was of such an obvious nature to plaintiff that it should have put him on notice that his rights were at stake. *Hulsey v. Kmart, Inc.*, 43 F.3d 555, 557 (10th Cir.1994). If plaintiff wanted to complain that his demotion was discriminatory, he should have filed a proper EEOC charge within 180 days of that action.

Moreover, it is doubtful that application of the continuing violation exception is proper in this case. In a case involving similar facts, where an ADEA plaintiff's charge was timely as relating to his departure from the employer but untimely with respect to an earlier demotion, the Fourth Circuit held that no tolling would occur

> unless the employee's failure to file in timely fashion is the consequence either of a deliberate design by the employer or of actions that the employer should unmistakably have understood would cause the employee to delay filing his charge. An employee's hope for rehire, transfer, promotion, or a continuing employment relationship ... cannot toll the statute absent some employer conduct likely to mislead an employee into sleeping on his rights.

*Price v. Litton Business Systems, Inc.*, 694 F.2d 963, 965–66 (4th Cir.1982); *English v. Whitfield*, 858 F.2d 957, 962–63 (4th Cir. 1988).

Although the Court cannot question the legality of plaintiff's initial demotion, the fact of the demotion and the events leading up to it are considered relevant to the charge that plaintiff's dismissal from employment was improper.

### III.

Because plaintiff has not introduced direct evidence of discrimination, the case must be analyzed under the inferential proof scheme of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

▉ The familiar inferential-proof framework requires that plaintiff first estab-

lish a prima facie case of discrimination. "While the burden is 'not onerous,' it is also not empty or perfunctory. Plaintiff's evidence must be such that, if the trier of fact finds it credible, and the employer remains silent, the plaintiff would be entitled to judgment as a matter of law." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 59 (4th Cir.1995) (citation omitted).

▉ If plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a valid reason for dismissal which, if believed, would establish that discrimination was not the motive for the defendant's action. This burden of defendant's is one of production, and does not operate to relieve discrimination plaintiffs of their ultimate burden of proof. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 456 n. 2 (4th Cir.1989). "If the defendant meets this burden of production, the presumption created by the prima facie case 'drops out of the picture,' and the plaintiff bears the ultimate burden of proving that she has been the victim of intentional discrimination." *Ennis*, 53 F.3d at 58, citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 503–12, 113 S.Ct. 2742, 2746–49, 125 L.Ed.2d 407 (1993).

### IV.

▉ To establish a prima facie case of age discrimination, the plaintiff must establish that (1) he is in the protected age group; (2) he was discharged; (3) at the time of discharge, plaintiff was performing his job at a level that met his employer's legitimate expectations; and (4) that plaintiff was replaced by a significantly younger employee with similar qualifications. *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1051 (4th Cir. 1987), *cert. denied*, 486 U.S. 1044, 108 S.Ct. 2037, 100 L.Ed.2d 621 (1988); *O'Connor v. Consolidated Coin Caterers Corp.*, —— U.S. ——, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (modifying the fourth prong from earlier requirement that the replacement be outside the protected class).

▉ Plaintiff has established that he was in the protective age group at the time of his dismissal from employment, thus satisfying the first two prongs of the prima facie case. However, the latter two prongs cannot be

sustained under the evidence before the court. It is manifestly clear that the plaintiff was not performing in a manner that satisfied his employer's legitimate expectations for quite some time, and was terminated because he did not make acceptable progress on the projects assigned to him. The employer was quite generous in repeatedly extending most deadlines from September, up through the date of plaintiff's termination on November 19, and had a right to expect that the work would be completed in a satisfactory manner.

Plaintiff disputes the critical assessment of his job performance. He claims that the tasks given to him were unrealistic, as he lacked control over other people who needed to contribute to the projects, lacked direct experience with certain computer programs that he was required to use, and in any event could not complete the tasks on such short deadlines. Plaintiff argues that management simply wanted his expensive salary out of its bottom line, and designed impossible special projects for him to fail as a pretext for his discriminatory dismissal.

In support of this argument, plaintiff claims that he had been performing in a completely satisfactory manner until his sudden demotion, and cites as proof of this claim his last Annual Performance and Development Review, conducted in February of 1993, on which he "exceeded or met the requirements of his position ... in all but one of twenty (20) categories." (Brief, p. 4). Plaintiff claims that he "received a rating of 98.9% out of a possible 100%." (Brief, p. 5). That is simply not so.

Five possible grades are possible in this evaluation for each element of plaintiff's job description: U (unacceptable level of performance), M— (often meets expectations but requires improvement), M (consistently meets expectations), M + (often exceeds expectations), and E (consistently exceeds expectations). Plaintiff scored 5 +'s, 23 M's, and 2 M −'s. These were then aggregated into twenty categories graded as: Exceeds, Meets +, Meets, Meets −, and Did not meet. Plaintiff scored 5 Meet +'s, 12 Meets, 2 Meet −'s, and one Did not meet. This translated to a score of 98.9%, on a *150%* scale. Overall, 0–50% is a Did not meet, up to 70% is Meets −, up to 100% is Meets, up to 120% is Meets +, and up to the maximum 150% rates an Exceeds.

Plaintiff's 98.9% is a respectable average grade, but it is by no means stellar. Had plaintiff's review been conducted more recently prior to his termination, and had he scored significantly higher than "C" average, the adverse employment actions might seem more anomalous. But it is not difficult to believe that over the course of six months, an employee's performance might fall from fair to demotable. Nor is it difficult to accept that a "C" average employee might, subsequent to a demotion, fail to perform his given tasks in a satisfactory manner.

▮ Plaintiff's attacks on the legitimacy of the employer's expectations of his performance constitute no more than speculation that the assignments were pretextual, designed to hide the discriminatory intent motivating the decision to terminate him. But "[c]onclusory assertions that [defendant's] state of mind and motivation are in dispute are not enough to withstand summary judgment." *Goldberg v. B. Green & Co., Inc.*, 836 F.2d 845, 848 (4th Cir.1988) (citations omitted) (applying inferential proof scheme to age discrimination); *Evans v. Technologies Applications & Service Co.*, 80 F.3d 954, 959 (4th Cir.1996). Summary judgment is appropriate where "[t]here is a lack of evidence that [the employer] *intended* that the [plaintiff] quit because of [his] age," *E.E.O.C. v. Clay Printing Co.*, 955 F.2d 936, 946 (4th Cir.1992) (emphasis original), and it similarly cannot be avoided where the evidence does not suggest that the employer intended for the employee to fail in his assigned tasks. The Court does not inquire into the wisdom of Moen's business decisions, including the aggressive manner in which it launched the Monticello line.

> It is not for this court or any other governmental agency to direct the business practices of any company ... [the employer] was free to make its business decisions, including reorganizing its work force, so long as it did not violate the ADEA. It is not ... the function of this court to second guess the wisdom of business decisions.

*Id.*

Because plaintiff was not performing his work in a satisfactory manner, he also cannot

prove that the woman who obtained the Reliability Lab Manager position, even if she were significantly younger, was similarly qualified.

The plaintiff has failed to establish a prima facie case of age discrimination.

### V.

 Assuming *arguendo* that the plaintiff established a prima facie case of age discrimination, the Court accepts the evidence offered as proof that the employer has articulated a legitimate, non-discriminatory reason to justify the dismissal: plaintiff simply did not complete the work assigned to him as a condition of being placed in the new position.

   \*     \*     \*     \*     \*     \*

Plaintiff's motion to re-open discovery is DENIED. Defendant's motion for summary judgment is GRANTED. The case is DISMISSED WITH PREJUDICE.

SO ORDERED.