**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

MICHAEL C. WILSON,
Plaintiff-Appellant,

v.

MARYLAND-NATIONAL CAPITAL PARK
AND PLANNING COMMISSION,
Defendant-Appellee,

and

STATE OF MARYLAND; MONTGOMERY
COUNTY, MARYLAND; DONALD K.
COCHRAN; ELIZABETH A. KREITER,
Captain; TIMOTHY B. BOYLE,
Lieutenant; MARY JO ELAM,
Sergeant; DONALD A. DEERING,
Commander,
Defendants.

No. 98-1650

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
J. Frederick Motz, Chief District Judge.
(CA-96-3809-JFM)

Argued: March 3, 1999

Decided: May 6, 1999

Before TRAXLER, Circuit Judge, VOORHEES, United States
District Judge for the Western District of North Carolina, sitting by
designation, and FABER, United States District Judge for the
Southern District of West Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** James Alexander Mogey, JAMES A. MOGEY, P.A.,
Annapolis, Maryland, for Appellant. Kenneth P. Barnhart, Associate
General Counsel, MARYLAND-NATIONAL CAPITAL PARK &
PLANNING COMMISSION, Riverdale, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Michael C. Wilson ("Wilson") appeals from the district court's
order granting summary judgment in favor of the Maryland-National
Capital Park and Planning Commission ("the Commission") on Wil-
son's claims under the Americans with Disabilities Act ("ADA"), 42
U.S.C.A. § 12101 - 12213 (West 1995 & Supp. 1998). For the reasons
set forth below, we affirm.

I.

Wilson was hired as a police officer by the Commission -- a public
body corporate of the State of Maryland -- in August of 1987. He
was officially assigned to the Maryland-National Capital Park Police
Division, which was a corps established to enforce criminal laws,
motor vehicle laws, and park regulations in and around neighborhood
parks owned by the Commission.**1** The enforcement of such laws and

_____

**1** The Commission is a bi-county agency with the power to acquire,
develop and administer a system of parks within a defined district in
Montgomery County and Prince George's County, Maryland. Md. Code
Ann. § 5-101 (1957).

regulations was considered a "significant task" on which Park Police officers were routinely evaluated. Park Police officers were also evaluated on specific performance criteria such as judgment, initiative, decision-making, and ability to adapt to the Problem Oriented Policing ("POP") Program.**2**

The Park Police Division determined the strengths and weaknesses of its officers, relying heavily upon results obtained from such routine evaluations. These results were tabulated on a "Performance Evaluation Rating Form," which utilized a five-tier rating system. Under this system, "exceptional," the highest rating, was followed in descending order by "very good," "good," "marginal," and "unsatisfactory."

Wilson was evaluated on August 30, 1992 by Sergeant Collins -- Wilson's supervisor at the time -- who rated his overall performance as "marginal." The Performance Evaluation form completed by Sergeant Collins noted that, "Wilson ha[d] been under [his] supervision since July 13, 1992. Since that time, he ha[d] received three (3) counseling forms in reference to marginal and unsatisfactory performance." Moreover, Wilson was admonished that he,"[b]etween now and his Annual Performance Evaluation . . . [,] must strive to improve in those areas rated as marginal . . . . " The Park Police Division's Merit System Rules and Regulations governed the evaluation process and identified the actions precipitated by Wilson's overall "marginal" rating:

> A career employee who is evaluated as "marginal" shall not receive an anniversary increment, and shall be placed on a probationary status for a period of not less than three months and not more than six months. During this probationary period the employee shall be counseled to improve performance. At the end of the probationary period a level of per-

_____

**2** The POP Program represents the Park Police's effort to be sensitive and responsive to its "customers that include, park maintenance operations, the community, politicians, etc." Each Park Police officer was trained in POP, and Park Police Lieutenant Timothy Boyle ("Boyle") noted that, "half of an officer's significant tasks/functions related to POP and . . . approximately 50% of an officer's overall rating is effected by POP."

3

formance of "Good" or better must have been attained in order for the employee to be eligible for an anniversary increment at the conclusion of the probationary period. <u>If a level of performance of "Good" or better has not been attained by the end of the six month's probation, the employee shall be removed from his/her position.</u>

Despite his lackluster performance in 1992, Wilson was not then placed on probation.

In July, 1994, Wilson disclosed to the Police Park Division's command staff that he had contracted bladder cancer. Wilson underwent surgery for his cancer in October, 1994, at which time a portion of his bladder was removed and replaced with a prosthesis. This required Wilson to take bathroom breaks every three to four hours. From this point forward, Wilson claims he was disabled pursuant to the ADA.[3]

Following his cancer surgery, Wilson returned to work for the remainder of 1994 after being cleared to do so by his physicians. He informed his Sergeant, Mary Jo Elam ("Elam") of the routine bathroom visits necessitated by his surgery. Sergeant Elam notified Wilson that he would have to give up patrol duty if his necessary bathroom visits became a problem. Wilson, however, was never demoted from his patrol position due to these increased bathroom visits.

On February 24, 1995, Wilson received an evaluation of his 1994 performance, which Sergeant Elam rated as "marginal" overall. The performance evaluation cited Wilson's failures with respect to production, judgment, decision-making, initiative and adaptation to the POP program. Sergeant Elam made only two references to Wilson's

_____

[3] The Commission argues on appeal that Wilson's bladder cancer does not constitute a "disability" as defined by the ADA. The district court assumed, but did not decide, that Wilson was a qualified individual with a disability. Without delving into the complexities which would inevitably accompany our application of the term "disability" to the facts of this case, we focus our attention on the district court's application of <u>McDonnell Douglas Corp.</u> v. <u>Green</u>, 411 U.S. 792 (1973), which supports the district court's holding.

4

health in the evaluation: (1) under a category termed "decision making," Sergeant Elam noted that Wilson "needed to be out on leave for an extended period of time in June. Instead of informing me of his need for leave, he said nothing. I advised him to call daily when he was out . . . but he failed to do so . . . . At one point, Officer Wilson did call in sick but decided to come to work anyway without advising me[;]" and (2) under a section called "initiative," Sergeant Elam noted that "[e]ven taking into consideration [Wilson's] unfortunate absence (approx. 8 weeks total), this cannot account for his severe decrease in productivity both qualitatively and quantitatively." Lieutenant Boyle, the Deputy Direct Services Commander, and Captain Elizabeth Kreiter ("Kreiter") reviewed Wilson's evaluation and agreed with Sergeant Elam's assessment that his performance had declined and was "marginal."

In accord with the rules and regulations of the Park Police Division, Wilson's "marginal" rating triggered a six-month probationary period. During the probationary period -- in May, 1995 -- Wilson filed a disability discrimination complaint with the EEOC naming Sergeant Elam as a respondent. From April through July 1995, Wilson, by his own request, was transferred to the night shift. There, Wilson was supervised by Sergeant Pierce. In May, however, Wilson learned that he would soon be transferred back to the day shift under Sergeant Elam's supervision. Wilson wrote to the Commission and asked not to be transferred, citing "medical reasons." The transfer nevertheless occurred on July 16, 1995.

Following the transfer and at the close of the probationary period, Sergeant Elam completed Wilson's cumulative final evaluation on September 29, 1995. Because Wilson's performance had not improved, he again received an overall "marginal" rating. Sergeant Elam noted that Wilson's performance of POP projects remained substandard as reported by Sergeant Pierce. Sergeant Elam also cited "numerous occasions" where Wilson gave his supervisor either faulty or inadequate information, requiring that Sergeant Elam "follow Officer Wilson's work very closely to verify facts and ascertain accuracy." Wilson's failure to inform his supervisor of his involvement in an accident -- occurring sometime in July, 1995-- was additionally cited as inappropriate.

5

Sergeant Elam did not mention Wilson's health problems at all in the final evaluation. She noted instead that "[t]here is no doubt that Officer Wilson is very capable of doing an acceptable job as a police officer," but "his failure to do his work, both quantitatively and qualitatively in all required areas[,] and his apparent refusal to communicate with his supervisor[,] are holding him back from realizing his potential as a valuable member of the Park Police team." Lieutenant Boyle and Captain Kreiter reviewed the cumulative evaluation and agreed both with the "marginal" rating and the resulting recommendation to terminate Wilson's employment.

Wilson initially challenged his termination in a grievance procedure before the Chiefs Committee[4] and thereafter, Wilson brought an ADA claim in the district court alleging discrimination based on his disability. Wilson now appeals the district court's order granting summary judgment in favor of the Commission on his claims under the ADA.

II.

We adjudicate ADA claims under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), "at least in those circumstances where the defendant disavows any reliance on discriminatory reasons for its adverse employment action." Ennis v. National Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 57-8 (4th Cir. 1995). Under McDonnell Douglas, the plaintiff bears the initial burden of proving a prima facie case of discrimination by a preponderance of the evidence. Id at 58. For discharge cases under the ADA, we have held a plaintiff must prove by the preponderance of the evidence that "(1) [ ]he was in the protected class; (2) [ ]he was discharged; (3) at the time of the discharge, [ ]he was performing [his] job at a level that met h[is] employer's legitimate expectations; and (4) h[is] discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." Ennis, 53 F.3d at 58.

_____

[4] The Chiefs Committee was a forum selected in the collective bargaining agreement to hear grievances between the Commission and the Park Police Division.

6

Applying this proof scheme to Wilson's ADA claim, we consider whether Wilson established a prima facie case of discrimination, placing specific emphasis on whether his job performance was adequate and whether the circumstances support a reasonable inference that the Commission unlawfully discharged him because of his disability. We find that Wilson has completely failed to meet his burden regarding these essential elements of the prima facie case.

A.

We first consider that Wilson presented no evidence that he was performing his duties at a satisfactory level at the time of his discharge. The Commission provided several evaluations and reviews of those evaluations indicating that Wilson was performing well below the Commission's "legitimate expectations." One such evaluation issued on August 30, 1992, prior to Wilson's bladder surgery, described his decision-making skills as substandard, and rated as "marginal" his ability to adapt to his responsibilities beyond those related to traffic enforcement.[5] Wilson's performance problems intensified up until the time of his discharge as revealed by subsequent evaluations citing his lack of initiative and failure to adapt to the POP concept. In response to substantial evidence revealing his performance as unacceptable, Wilson submitted only a single annual evaluation dated January 12, 1994. That evaluation rated Wilson's performance as "good" overall, but indicated that Wilson "ha[d] not adopted well to the POP program, and that he "seem[ed] to have limited himself to traffic enforcement."[6]  Considering the complete dearth of evidence indicating otherwise, we are satisfied that no reasonable factfinder could conclude that Wilson was performing up to the Commission's legitimate expectations at the time of his discharge.

_____

[5] Traffic enforcement constituted only a minor portion of Wilson's responsibilities which Sergeant Elam described as "many-faceted."

[6] The fact that Wilson was performing at an acceptable level in January 1994 does not establish satisfactory performance-- meeting the Commission's legitimate expectations -- at the time of his discharge in September 1995. See O'Conner v. Consolidated Coin Caterers Corp., 56 F.3d 542, 547 (4th Cir. 1995), rev'd on other grounds, 516 U.S. 973 (1996) (holding that a review of an employee's 1989 performance was irrelevant to a determination of whether his performance was satisfactory at the time of his termination in August of 1990).

7

B.

We additionally note Wilson's failure to demonstrate that "h[is] discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." Ennis, 53 F.3d at 58. Nothing in the record links Wilson's discharge to his cancer. While Wilson may have presented sufficient evidence to support a strained relationship between him and Sergeant Elam, this is too slender a reed upon which to base a finding of intentional discrimination. [7] Rather, Wilson must present affirmative evidence that either Sergeant Elam or other Commission employees intentionally discriminated against him because of his disability.[8] Wilson has failed to produce such evidence. "At bottom, [Wilson] imputes to [the Commission] discriminatory motive without factual support." Ennis, 53 F.3d at 62.

Wilson's substandard performance was documented as early as August 30, 1992, approximately two years prior to the date when Wilson claims to have become disabled. When Wilson's level of performance deteriorated further over the next few years, he was placed on probation pursuant to the Commission's written policies. Also in accord with the Commission's written policies, Wilson was discharged when he failed to improve his performance to an overall rating of "good" during the probationary period. The Commission's reasons for dismissing Wilson were "clear and reasonably specific." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 258

_____

[7] Following his surgery, Wilson requested and received a transfer to the night shift under the supervision of Sergeant Pierce. Thereafter, the Commission decided to transfer Wilson back to the day shift under the direction of Sergeant Elam. Wilson requested as a "reasonable accommodation" that he be allowed to remain under the Supervision of Sergeant Pierce, but he nonetheless was transferred back to Sergeant Elam's shift during the day. Although Wilson's request implies dissension between he and Sergeant Elam, it does not lead to the further implication that Sergeant Elam intentionally discriminated against him because of his cancer. Importantly, Sergeant Elam's evaluations of Wilson do not contain any criticisms that could be related to his disability.
[8] Even at this earliest stage of the McDonnell Douglas proof scheme, Wilson "has the initial burden of proving . . . discrimination by a preponderance of the evidence." Ennis, 53 F.3d at 58 (emphasis supplied).

8

(1981). Moreover, Wilson has presented no evidence that his treatment in this regard was in any way incongruous with that of any other Commission employee exhibiting such substandard performance. The ADA does not require that protected class members be shielded from the consequences of their poor performance and inadequate qualifications, but merely prevents an employer from treating some employees less favorably than others because of their disability.

## C.

Wilson's bald allegations of intentional discrimination are insufficient to establish a prima facie case under the ADA. While the prima facie burden is "not onerous," Burdine , 450 U.S. at 253, "it is also not empty or perfunctory." Ennis, 55 F.3d at 59. Plaintiff's evidence must be such that, if the trier of fact finds it credible, and the employer remains silent, the plaintiff would be entitled to judgment as a matter of law. Burdine, 450 U.S. at 254. Wilson has failed to meet even this most generous standard of proof. To hold otherwise would be to eviscerate the prima facie burden in ADA discrimination cases.

AFFIRMED

9