MICHAEL, Circuit Judge,
dissenting:
William Runnebaum was fired six months after he transferred into the trust department at NationsBank in Baltimore. He then brought suit against the bank under the Americans with Disabilities Act (ADA), alleging that he was fired because he is infected with the Human Immunodeficiency Virus (HIV). NationsBank moved for summary judgment claiming that it fired Runnebaum because of his performance rather than his disease, and the district court granted summary judgment on this theory. No one contested that Runnebaum’s asymptomatic HIV infection was a “disability” for purposes of the ADA. Now, however, the majority concludes that Runnebaum’s HIV infection is not a disability. It bases this holding on its textual reading of the ADA and its own conclusions about the state of the record. There is much that the majority must ignore, however, to affirm on the ground that Run-nebaum is not disabled. First, it must ignore that NationsBank conceded Runneb-aum’s disability before the district court. Second, it must ignore the physical effects of HIV upon the body even when the disease is in its asymptomatic stage. Third, it must ignore a wealth of legislative history and administrative interpretation contradictory to its reading. Finally, it must ignore evidence that NationsBank regarded Runnebaum as disabled — evidence that is sufficient to create an issue of material fact.
I believe the majority means to create a per se rule excluding those with asymptomatic HIV from the protections of the ADA. It essentially admits as much, noting that its definition of disability “suggests that asymptomatic HIV infection will never qualify” as a disability. Ante at 169. And by finding that “the facts pertaining to this issue are sufficiently developed,” ante at 166 n. 4, even though Runnebaum has had no opportunity to present facts about disability, the majority shuts the door on whatever opportunity its opinion might have otherwise left open. The majority’s rejection, in substance if not in form, of the case-by-case inquiry suggested by Ennis v. National Ass’n of Bus. & Educ. Radio, Inc., 53 F.3d 55 (4th Cir.1995), moves this circuit even further from the mainstream of ADA interpretation. More importantly, it moves us completely away from the interpretation that Congress clearly intended. I therefore respectfully dissent.
*177 I.
NationsBank conceded Runnebaum’s disability in district court. In a memorandum supporting its motion for summary judgment, NationsBank acknowledged that Run-nebaum “is a member of a protected class (HIV-positive being a protected category under 42 U.S.C. § 12102( [2])).” J.A. 46. It repeated this concession in its reply brief, saying that Runnebaum “can establish the existence of only two of the four [elements of a prima facie case] — he is in a protected group and he was discharged.” J.A. 633. The district court accepted this concession and “assume[d], for the purposes of the [ ] motion, that even an asymptomatic HIV infection may be a disability within the act.” J.A. 570. NationsBank again conceded this issue in its initial brief to this court. See Brief for Appellee at 19 (“[T]he plaintiff could establish the existence of only two of the four McDonnell Douglas elements — he may have been in a protected group and he was discharged.”). In its reply (before the en banc court) to the arguments of amici Whitman-Walker Clinic and the EEOC, Nati-onsBank argued that “[t]heir appearance to brief this issue is a distraction from the main issues of the case because the ‘disability’ issue was not a ground for summary judgment below and was not briefed or argued on appeal to the panel.” Appellee’s Answer to the Briefs Amicus Curiae at 2.
“Ordinarily an appellate court does not give consideration to issues not raised below.” Hormel v. Helvering, 312 U.S. 552, 556, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941); see also Singleton v. Wulff 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976) (“It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below.”). We have consistently noted the applicability of this general rule. See, e.g., Domino Sugar Corp. v. Sugar Workers Local Union 392, 10 F.3d 1064, 1068 (4th Cir.1993); Liberty Corp. v. NCNB Nat’l Bank, 984 F.2d 1383, 1389 (4th Cir.1993). NationsBank, by its concession in district court, has waived its right to assert non-disability as an alternative ground for affirming summary judgment. See United States v. Patrin, 575 F.2d 708, 712 (9th Cir.1978) (“It is immaterial whether the issue was not tried in the district court because it was not raised or because it was raised but conceded by the party seeking to revive it' on appeal.”).
I know that “[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.” Singleton, 428 U.S. at 121, 96 S.Ct. at 2877. However, Singleton only recognized exceptions to the general rule in cases “where the proper resolution is beyond any doubt or where injustice might otherwise result.” Id. (citations and quotations omitted). Some circuits have recognized an additional exception in cases “[w]hen the issue conceded or neglected in the trial court is purely one of law and either does not affect or rely upon the factual record developed by the parties or the pertinent record has been fully developed.” Patrin, 575 F.2d at 712 (citations omitted). The majority appears to rely on this exception.[1] In discussing why it chose to reach the disability issue, the majority says that “[w]hether asymptomatic HIV infection is a disability under the statute is primarily a question of law, the facts pertaining to this issue are sufficiently developed, and the issue was briefed and argued on appeal.” Ante at 166 n. 4. This assertion by the majority is contrary to both the law of this circuit and the reality of how this case has been litigated.
Other courts have held that asymptomatic HIV is a per se disability that requires no development of the facts. See, e.g., Gates v. Rowland, 39 F.3d 1439, 1446 (9th Cir.1994) (discussing Rehabilitation Act). Our decision in Ennis v. National Ass’n of Bus. & Educ. Radio, Inc., 53 F.3d 55 (4th Cir.1995), howev *178 er, rejected this approach. According to En-nis, “the plain language of [42 U.S.C. § 12102(2) ] requires that a finding of disability be made on an individual-by-individual basis.” Id. at 59. Thus, Ennis directs us to make “case-by-case determinations of whether a given impairment substantially limits a major life activity, whether an individual has a record of such a substantially limiting impairment, or whether an individual is being perceived as having such a substantially limiting impairment.” Id at 60. The majority specifically “reaffirm[s] our holding in Ennis; accordingly, a finding that Runnebaum has a disability under this provision must be made on an individualized basis.” Ante at 166. I do not see how the majority can claim that the issue of Runnebaum’s disability is “primarily a question of law” and then turn around and endorse Ennis’s individualized inquiry.
The majority also asserts that “the facts pertaining to this issue [disability] are sufficiently developed.” Ante at 166 n. 4. This assessment is not fair to Runnebaum, who had no hint that he should have been developing or making a summary judgment record on disability. At the en banc oral argument Runnebaum’s lawyer told us how Nations-Bank’s concession on this issue affected his litigation strategy:
The problem with this issue is because it was never raised below ... nobody ever took any discovery on this question. And the record is pretty sparse on that whole issue.
The record was not developed on that issue. It never became an issue.
Under the facts of this case, the bank has never taken the position, and one of the difficulties that I have here, and I wish I had a better record, is because it was never an issue anywhere. Maybe it should have been, but it wasn’t. Nobody raised it. It was assumed that he met the standards under the Act to be disabled, and the whole case was premised, discovery and everything was premised from that point forward, on the fact that it was conceded that he was disabled. Now that may have been a mistake, but that’s the state of the record.
En Banc Oral Argument, Mar. 5, 1997. These frank comments by Runnebaum’s lawyer confirm that consideration of the disability issue on the current state of the record substantially prejudices Runnebaum’s- case.
Nevertheless, the majority proceeds to examine the merits of this issue on the current record and concludes, not surprisingly, that there is insufficient evidence to support a finding that Runnebaum is disabled. See ante at 169 (“Runnebaum produced no evidence showing that he was impaired, to any degree, during the relevant time period.”); id. at 172 (“[T]here is no evidence in the record that Runnebaum, because of his infection, forewent having children or engaging in intimate sexual relations.”); id. at 173 (“None of this evidence, however, is sufficient to create a genuine issue of fact concerning the perception of Runnebaum’s HIV infection held by the relevant decisionmakers at Nati-onsBank.”); id. at 174 (“NationsBank did not regard or perceive Runnebaum as having [ ] an impairment [that substantially limited one or more of the major life activities], and the record does not contain evidence demonstrating otherwise.”). The majority has somehow assumed that Runnebaum could present no other evidence on these points. But Runneb-aum had no reason to proffer such evidence because his disability was not contested.[2]
*179 By deciding the disability issue before Runnebaum has had an opportunity to lay out his case on it, the majority ignores the purpose for the general rule prohibiting consideration of an issue that was conceded in district court. The reason for the rule, as discussed by the Supreme Court in Hormel, is quite relevant to this case:
For our procedural scheme contemplates that parties shall come to issue in the trial forum vested with authority to determine questions of fact. This is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues which the trial tribunal is alone competent to decide; it is equally essential in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence.
Hormel, 312 U.S. at 556, 61 S.Ct. at 721. In Singleton the Court reversed the Eighth Circuit’s decision to consider an issue not passed upon by the trial court. The Court said, “[w]e have no idea what evidence, if any, petitioner would, or could, offer in defense of this statute, but this is only because petitioner has had no opportunity to proffer such evidence.” Singleton, 428 U.S. at 120, 96 S.Ct. at 2877. Moreover, even if the petitioner had no other evidence to present, he “should have the opportunity to present whatever legal arguments he may have in defense of the statute.” Id. These factors compelled the Court to reverse, despite its acknowledgment that decisions about whether to consider an argument not raised below are usually left to the appellate court’s discretion. See id. at 121, 96 S.Ct. at 2877.
If the majority feels that the disability issue is dispositive and must be addressed despite the concession in district court, it should at least remand the case for further proceedings on this issue. Better yet, the majority should accept the concession and reach only the issues that were presented below. That would be in line with how we have treated ADA cases on review of summary judgment in the past. In Ennis, for example, we found “no evidence” to support the conclusion that the individual with HIV had a disability under the ADA. Ennis, 53 F.3d at 60. Nevertheless, we said that “because the record as to any limitations on [the HIV-positive individual’s] major life functions, or perceptions of any such limitations, may be less than fully developed at this stage of the litigation, we will assume for the purposes of this ease that [he] was disabled under the Act.” Id. Ennis was not the first time that we have made such an assumption. See Doe v. University of Maryland Med. Sys. Corp., 50 F.3d 1261, 1265 (4th Cir.1995) (“The parties do not dispute that infection with HIV is a disability_”). In its haste to address this question, however, the majority ignores the procedural posture of this litigation and makes the ill-founded assertion that Runnebaum has not offered sufficient evidence of disability. Before coming to such a conclusion, we at least owe Runnebaum the normal opportunity to offer evidence and legal argument on this issue.
II.
NationsBank’s concession aside, there is sufficient support for Runnebaum’s claim of disability to defeat summary judgment. Runnebaum is disabled under the ADA if he can meet the requirements of either 42 U.S.C. § 12102(2)(A) or § 12102(2)(C). I will discuss each of these provisions in turn.
A.
Section 12102(2)(A) defines the term “disability” with respect to an individual as “a physical or mental impairment that substantially limits one or more of the major life activities of such individual.” The majority breaks this definition into two components: first, the individual must have a “physical or mental impairment,” and second, that impair *180 ment must “substantially limit[ ] one of more of the major life activities of such individual.” Runnebaum must satisfy both of these requirements to be disabled under § 12102(2)(A). The majority concludes that he can satisfy neither of them, but I disagree.
1.
The majority first holds that being infected with the HIV virus is not a physical or mental impairment if the virus produces no symptoms. Its analysis is quite straightforward: asymptomatic HIV infection is not an impairment because “without symptoms, there are no diminishing effects on the individual.” Ante at 168. The majority recognizes that its analysis is contrary to two other circuits and the relevant legislative history. Moreover, the majority ignores the regulations that hold HIV to be a per se impairment. The majority therefore limits itself to its own interpretation of the text and argues'that “the statutory meaning of ‘impairment’ is plain and unambiguous.” Id. at 168.
I accept the dictionary definitions of “impair” and “impairment” adopted by the majority. “Impair” is to “make worse by or as if by diminishing in some material respect,” or “[t]o weaken, to make worse, to lessen in power, diminish, or relax, or otherwise affect in an injurious manner.” Ante at 168. “Impairment” is a “decrease in strength, value, amount, or quality,” a “deterioration” or a “lessening.” Id. What the majority fails to recognize is that under any of these definitions, the effects of the HIV virus on the victim would constitute an “impairment.” Medical researchers once believed that HIV lay dormant in the body after the initial infection. “It turns out, however, that the body and the virus engage in mortal combat from the beginning.” Christine Gorman, Battling the AIDS Virus: There’s Still No Cure, But Scientists and Survivors Make Striking Progress, Time, Feb. 12, 1996, at 62, 63. The virus attacks the victim’s immune
system immediately; it enters the hemic (blood) and lymphatic systems and begins reproducing itself within a group of white blood cells knows as CD4 cells. See id. at 64 (describing how during the first stage “[tjhousands of HIV particles are reproducing themselves” in CD4 cells); Martin A. Nowak, AIDS Pathogenesis: From Models to Viral Dynamics in Patients, 10 J. Acquired Immune Deficiency Syndromes & Human Retrovirology SI, SI (Supp. 1 1995) (“After infection with HIV, patients initially enter the primary infection phase, which usually last for a few weeks and is characterized by very high viral levels and a decline in CD4 cell counts.”). During this first stage, the infection may cause a mononucleosis-type illness known as acute retroviral seroconversion syndrome.[3] See Michael S. Saag, Natural History of HIV-1 Disease, in Textbook of AIDS Medicine 45, 46 (Samuel Broder et al. eds., 1994). After the disease’s initial attack, the body’s immune system begins a counterattack sufficient to stifle these initial symptoms. Even though the infected individual is asymptomatic, the virus continues to reproduce, slowly wearing away at the immune system until the final and fatal stage of the disease. See id. at 49 (“[A] slow progressive decline in CD4-positive cells is typically seen during this time.”); Cecil Textbook of Medicine 1908 (James B. Wyngaarden et al. eds., 19th ed. 1992) (“HIV infection - can therefore be considered a disease of the immune system, characterized by the progressive loss of CD4+ lymphocytes, with ultimately fatal consequences for the infected host.”). Recent studies have shown that the focal point of HIV attack during the asymptomatic period is in the individual’s lymph system. See Christine Gorman, The Exorcists: Applying a Potent Combination of New Treatments, Medical Researchers Are Determined to Expel the Terrible Specter of AIDS as an Invincible Disease, Time, Fall 1996, at 64, 65 (“The big fight [between HIV and the immune system] occurs in the harder-to-study lymph nodes, where day after *181 day, year after year the body battles the virus to a standstill before finally exhausting its immunological reserves.”).
The majority contends that this immediate impact on the immune system is at “so low a level of generality” that it does not actually constitute a “diminishing effect.” Ante at 168 n. 6. It views the terms “impairment” and “symptoms” as synonymous and therefore concludes that any asymptomatic disease cannot constitute an impairment. See ante at 167-68. Nowhere does the text of the statute, however, require a “physical impairment” to be outwardly visible or manifest. The effects of the HIV virus may not be noticeable to the outside world until the later stages of the disease, but the body is impaired as soon as the disease enters it.[4] As former Surgeon General C. Everett Koop said in a letter to the Justice Department:
[F]rom a purely scientific perspective, persons with HIV infection are clearly impaired. They are not comparable to an immune carrier of a contagious disease such as Hepatitis B. Like a person in the early stages of cancer, they may appear outwardly healthy but are in fact seriously ill.
Letter from C. Everett Koop, M.D., Surgeon General, to Douglas W. Kmiec, Acting Assistant Attorney General, Office of Legal Counsel, Department of Justice, reprinted in 8 Fair Empl. Prac. Manual (BNA) No. 641 at 405:18, 405:19.[5]
In my opinion, HIV infection comfortably fits within the plain and unambiguous meaning of impairment. Admittedly, however, the meaning of “impairment” is broad enough that it might be considered somewhat ambiguous. Cf. Torcasio v. Murray, 57 F.3d 1340, 1353 (4th Cir.1995) (finding the ADA’s textual definition of “disability” to be “unilluminating”), cert. denied, — U.S. -, 116 S.Ct. 772, 133 L.Ed.2d 724 (1996). Even if the majority does not agree with my textual analysis, it must at least admit that this analysis is sufficiently plausible to make the statute ambiguous. It therefore should have turned to the legislative history for guidance. See Green v. Bock Laundry Machine Co., 490 U.S. 504, 508, 109 S.Ct. 1981, 1984, 104 L.Ed.2d 557 (1989) (“Concluding that the text is ambiguous ..., we then seek guidance from legislative history....”); United States v. Irvin, 2 F.3d 72, 76-77 (4th Cir.1993) (“[B]ecause the relevant statutory language is susceptible to interpretations other than the one suggested by the Government and is therefore ambiguous, we turn to the legislative history for assistance in ascertaining the intent of Congress.”). One look at the legislative history, however, reveals why the majority clings to its textual analysis.
Both House and Senate committee reports clearly state that infection with the HIV virus is to be considered an impairment. House Report 101-485 states:
It is not possible to include in the legislation a list of all the specific conditions, diseases, or infections that would constitute physical or mental impairments.... The term includes, however, such conditions, diseases, and infections as ... infection with the Human Immunodeficiency Virus ....
H.R.Rep. No. 101-485, pt. 2, at 51, reprinted in 1990 U.S.C.C.A.N. 303, 333; see S.Rep. No. 101-116, at 22 (same). Part Three of the House Report reiterates that “[ajlthough the definition [of impairment] does not include a list of all the specific conditions, diseases, or infections that would constitute physical or mental impairments, examples include ... *182 infection with the Human Immunodeficiency Virus.” H.R.Rep. No. 101-485, pt. 3, at 28, reprinted in 1990 U.S.C.C.A.N. 445, 451. The committee reports could not be clearer: infection with HIV constitutes an “impairment” under the ADA.[6]
Because the committee reports are the “authoritative source for finding the Legislar ture’s intent,” Garcia v. United States, 469 U.S. 70, 76, 105 S.Ct. 479, 483, 83 L.Ed.2d 472 (1984), the above-cited passages are decisive as to the intent of Congress. A survey of additional legislative history is significant, however, if only to show the breadth of the congressional presumption that individuals with HIV would be covered. Numerous members of Congress took to the floor to praise the ADA for its protection of HIV-infected individuals, including those who were asymptomatic. See, e.g., 135 Cong. Rec. S10768 (daily ed. September 7, 1989) (statement of Sen. Kennedy) (noting that “in the particular provision of the legislation we have pointed out very clearly, if you are asymptomatic and HIV positive, you are protected”); 136 Cong. Rec. H2626 (daily ed. May 22, 1990) (remarks of Rep. McDermott) (“I am particularly pleased that this act will finally also extend necessary protection to people with HIV disease. These are individuals who have any condition along the full spectrum of HIV infection — asymptomatic HIV infection, symptomatic HIV infection or full-blown AIDS.”); 136 Cong. Rec. H4623 (daily ed. July 12, 1990) (remarks of-Rep. Owens) (“As I noted, the ADA will offer critical protection to people with HIV disease in a range of areas. People with HIV disease are individuals who have any condition along the full spectrum of HIV infection.— asymptomatic HIV infection, symptomatic HIV infection or full-blown AIDS.”); 136 Cong. Rec. H4626 (daily ed. July 12, 1990) (remarks of Rep. Waxman) (“People with HIV disease are those who have the spectrum of the disease — from asymptomatic HIV infection, to symptomatic HIV infection, to full-blown AIDS- All such individuals are covered under the first prong of the definition of disability in the ADA.”).
The legislative history plainly -demonstrates that Congress intended for HIV to be considered a disability. Indeed, it is difficult to imagine a case in which the legislative history could be more explicit.
Although the majority acknowledges that the legislative history is contrary to its interpretation of “impairment,” it does not discuss the many administrative regulations which have interpreted the term. Congress gave the EEOC authority under 42 U.S.C. § 12116 to issue regulations with respect to subchapter I, the statutory subchapter regarding employment.[7] See Torcasio, 57 F.3d at 1353 (“The [ADA and the Rehabilitation Act] do not define ‘physical or mental impair *183 ment’ or ‘major life activity,’ instead leaving that task to the applicable regulations.”). The EEOC has issued extensive regulations defining the terms used in the ADA, including “physical or mental impairment.” Although the regulations themselves do not specifically mention HIV, 29 C.F.R. § 1630.2(h)(1) does include in the definition of impairment “any physiological disorder, or condition ... affecting one or more of the following body systems: ... hemic and lymphatic.” As discussed above, the HIV virus attacks the hemic and lymphatic systems as soon as it enters the body. Thus, the HIV infection clearly fits within the regulatory definition of impairment.[8]
The majority attempts to shore up its interpretation of “impairment” by claiming that “Runnebaum produced no evidence showing that he was impaired” and that “Runnebaum does not assert that he suffers an actual physical or mental impairment because of his HIV infection.” Ante at 169. As I said in part I, however, Runnebaum never had the occasion to make such assertions or to produce such evidence because this issue was not contested in district court. The majority also points to Runnebaum’s application for a transfer to the trust department, where he checked a box indicating he was not handicapped. Such a check mark has little relevance to whether Runnebaum has an “impairment” under 42 U.S.C. § 12102(2)(A). His decision not to check the “handicapped” box could have been based on his assumption that he could physically perform the job in trusts. Moreover, Runneb-aum might have feared that the bank would be prejudiced against him if it knew that he was HIV-positive. Finally, the analysis of Runnebaum’s doctor that Runnebaum “had no ill effects from the disease or the medications” merely means that Runnebaum remained asymptomatic. As discussed above, the lack of symptoms does not mean that Runnebaum was not impaired.[9]
In sum, the majority’s interpretation cannot withstand the stark realities of asymptomatic HIV, the direct and unambiguous legislative history, and the administrative regulations, all of which confirm that Run-nebaum was impaired.[10]
2.
The second requirement of 42 U.S.C. § 12102(2)(A)’s definition of disability is that the individual’s impairment must “substantially limit[ ] one or more of the major life activities of such individual.” Although Run-nebaum himself did not offer argument or evidence on this question, amici EEOC and the Whitman-Walker Clinic Legal Services Department contend that the HIV virus substantially limits the major life activities of procreation and intimate sexual relations. The majority, although “not certain” and “not convinced” that procreation and intimate sexual relations are major life activities un *184 der the ADA, assumes that they are. Ante at 170-71. However, it finds that Runneb-aum’s participation in these activities is not substantially limited by his HIV infection.
The question of whether procreation and intimate sexual relations are “major life activities” under the ADA is admittedly “not free from doubt.” Abbott v. Bragdon, 107 F.3d 934, 939 (1st Cir.1997) (discussing procreation). The words of the statute, however, are certainly broad enough to include these activities. Procreation is perhaps the most important life activity, since we would cease to exist as a species if we no longer reproduced. See id. at 940 (finding that “reproduction ... is both the source of all life and one of life’s most important activities”). And intimate sexual relations, while less important in nature’s scheme, have consumed enough of humanity’s energy and interest to count among such activities.
The phrase “major life activity” is sufficiently ambiguous to require a look at the legislative history and the implementing regulations for interpretive guidance. Once again, the legislative history speaks authoritatively about its meaning. The House Committee Report says that “a person infected with the Human Immunodeficiency Virus is covered under the first prong of the definition of the term ‘disability’ because of the substantial limitation to procreation and intimate sexual relationships.” H.R.Rep. No. 101-485, pt. 2, at 52, reprinted in 1990 U.S.C.C.A.N. 303, 334. Thus, the legislative history confirms not only that procreation and intimate sexual relationships are major life activities but also that such activities are substantially limited by HIV.
The regulations are less decisive but also offer support for amici’s position. Procreation and intimate sexual relations are not included in the list of major life activities. See 29 C.F.R. § 1630.2© (“Major Life Activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.”). However, by beginning its list with the words “such as,” the regulation indicates that its list is not intended to be exclusive. See also 29 C.F.R. pt. 1630, app. § 1630.2© (“This list is not exhaustive.”). The appendix to the regulations specifically states that “[ojther impairments, ... such as HIV infection, are inherently substantially limiting.” Id. pt. 1630, app. § 1630(j) (discussing the definition of “substantially limits”). Since we must give an agency’s interpretation of its own regulation “controlling weight unless it is plainly erroneous or inconsistent with the regulation,” Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994) (quotations omitted), the EEOC’s interpretation resolves the issue.
The majority nevertheless holds that asymptomatic HIV does not substantially limit procreation or intimate sexual relations for purposes of the ADA. The majority bases this holding on a distinction it draws between an impairment that is substantially limiting as a physical matter and an impairment that is substantially limiting as a behavioral matter. According to the majority, an impairment is only a disability under the ADA if it is substantially limiting as a physical matter. In other words, the impairment must render the individual physically incapable of performing the activity.
While it has some intuitive plausibility, this distinction is nowhere within the text, legislative history, or regulatory interpretation of the ADA. The text only requires “a physical or mental impairment that substantially limits one or more of the major life activities.” There is no requirement that the impairment physically limit the life activity, nor is there any specification about how the impairment must substantially limit that activity. Once again, the majority has no authority to bolster its interpretation. The legislative history makes no mention of such a distinction and, as noted above, says specifically that HIV does substantially limit procreation and intimate sexual relationships. The EEOC regulations do not draw such a distinction; they instead create a broad definition that easily covers asymptomatic HIV. See 29 C.F.R. § 1630.2(j)(ii) (defining “substantially limits” in part as “[significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condi *185 tion, manner, or duration under which the average person in the general population can perform that same major life activity”). And, as noted above, the EEOC’s interpretation of its regulations directly states that HIV is “inherently substantially limiting.” 29 C.F.R. pt. 1630, app. § 1630®.
Moreover, the majority’s distinction goes against common sense. The majority claims that “as a physical matter, nothing inherent in the virus substantially limits procreation or intimate sexual relations.” Ante at 172 (emphasis in original). It is HIV’s physical effects, however, upon procreation and intimate sexual relations that make it substantially limiting. An individual with HIV stands a significant chance of infecting others if he engages in these activities, and this prospect of spreading the disease is a substantial limitation. See Memorandum from Douglas W. Kmiec, Acting Assistant Attorney General, Office of Legal Counsel, to Arthur B. Culvahouse, Jr., Counsel to the President (Sept. 27, 1988), reprinted in 8 Fair Empl. Prac. Manual (BNA) No. 641 at 406:1, 405:7 [hereinafter Kmiec Memorandum] (“There is little doubt that procreation is a major life activity and that the physical ability to engage in normal procreation — procreation free from the fear of what the infection will do to one’s child — is substantially limited once an individual is infected with the AIDS virus.”).[11] As the court said in Abbott, “[n]o reasonable juror could conclude that an 8% risk of passing an incurable, debilitating, and inevitably fatal disease to one’s child is not a substantial restriction on reproductive activity.” Abbott, 107 F.3d at 942.[12]
The majority also claims that even if individuals with asymptomatic HIV can be substantially limited in a major life activity, Run-nebaum has presented no evidence that he himself has been so limited. Once again, however, the majority is using the fact that NationsBank conceded this issue in district court to prejudice Runnebaum in this court. Regarding procreation, the majority notes that “nothing in the record so much as suggests that Runnebaum was at all interested in fathering a child.” Ante at 172. Of course, since his disability was uncontested in district court, he had no reason to offer such evidence in the summary judgment proceedings. Regarding intimate sexual relations, the majority makes this bold assertion: “the record makes clear that Runnebaum’s ability to engage in intimate sexual relations was not substantially limited by his HIV infection; the record shows that he concealed his HIV infection from his lover.” Ante at 172. That is too much of a leap for me. I would not presume to know the status of Runneb-aum’s “intimate sexual relations” merely because he has a boyfriend. Again, Runneb-aum has had no occasion or reason to testify about the effect that HIV has had upon his sexual relations.
3.
The majority has effectively amended 42 U.S.C. § 12102(2)(A) to exclude individuals with asymptomatic HIV. It effects this result through a dizzying flurry of alternate holdings: asymptomatic HIV is never an impairment; even if it can be an impairment, Runnebaum has not proven that he is impaired; even if it always is an impairment, *186 then it does not substantially limit major life activities; even if it can substantially limit major life activities, Runnebaum has not proven that he is so limited. These alternate holdings might betray an uncertainty on the majority’s part, but they do not lessen the authority of any particular holding. The majority’s opinion must be taken for what it is: a per se rule that excludes those with asymptomatic HIV from the protections of the ADA. This result runs counter to the statutory text, medical research, legislative history, administrative regulations, and even our decision in Ennis. This result is plainly wrong.
B.
Runnebaum could alternatively be protected under the ADA if he meets the requirements of 42 U.S.C. § 12102(2)(C). That provision defines a disability as “being regarded as having such an impairment.” The “such an impairment” language apparently refers to the definition of impairment in § 12102(2)(A): “a physical or mental impairment that substantially limits one or more of the major life activities of such individual.” EEOC regulations provide three ways that an individual may be regarded as having “such an impairment:”
(1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;
(2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such an impairment; or
(3) Has none of the impairments defined in ... this section but is treated by a covered entity as having a substantially limiting impairment.
29C.F.R. § 1630.2(0.
The majority holds that none of the evidence produced by Runnebaum “is sufficient to create a genuine issue of fact concerning the perception of Runnebaum’s HIV infection held by the relevant decisionmakers at Nati-onsBank.” Ante at 173. The majority discusses three items of evidence on this issue: the opening of Runnebaum’s AZT packages by bank employees, Michael Brown’s reaction to the news of Runnebaum’s HIV status, and Ann Pettit’s ultimate decision to fire Runnebaum. It then concludes that this evidence does not preclude summary judgment. In reaching this conclusion, however, the majority understates the evidence showing that Runnebaum was regarded as disabled, and it inexplicably makes inferences in favor of Na-tionsBank. When Runnebaum’s evidence is considered fully and all reasonable inferences are made in his favor (a must on summary judgment), it becomes clear that there is a genuine factual issue about whether the bank considered Runnebaum to be disabled.
Runnebaum never explicitly addressed this issue, since it was not raised in district court. However, he did produce evidence relevant to the issue that was contested, namely, whether NationsBank fired him because of his HIV-positive status. This evidence is also relevant to whether NationsBank regarded Runnebaum as being disabled. After all, if the bank fired Runnebaum because of his HIV status, then it must have regarded him as substantially limited in his ability to work.
There is not a great deal of direct evidence that the bank regarded Runnebaum as disabled. This should not be surprising, however, because “only rarely will a plaintiff have direct evidence of discrimination.” Geraci v. Moody-Tottrup, Int’l, Inc., 82 F.3d 578, 581 (3d Cir.1996). Moreover, we are only concerned at this stage with whether there is a material issue of fact. Runnebaum’s direct evidence is the testimony of Michael Brown, the bank’s Baltimore city manager for the trust department. Brown was the senior managing officer for the group in which Run-nebaum worked, and Runnebaum’s correspondence was sent out over Brown’s signature. Brown also stayed in close contact with Ann Pettit, Runnebaum’s departmental supervisor, and Brown advised Pettit extensively on Runnebaum’s performance. One night, on a social occasion, Runnebaum told Brown of his HIV-positive status. Brown described his reaction to the news as follows:
My feeling about that whole evening, I mean, it almost knocked the wind out of me, because I had never been in a situation *187 and had never known anybody on a daily basis or knowingly worked with anybody, and it never crossed my mind.
_ And I can remember just thinking— I remember being in a state of panic, panic because I was thinking how am I going to work, you know, and be a friend to somebody who is HIV positive. I’ve educated myself a lot since then. But, you know, suppose he dies on me. Should I tell Ann[Pettit] at this point, should I tell the bank? I remember feeling panicky, uncontrolled.
J.A. 507-08. This direct evidence is bolstered by a variety of circumstantial evidence that NationsBank regarded Runnebaum as disabled. First, there is evidence that the bank knew of Runnebaum’s HIV status. Obviously, Brown knew that Runnebaum was HIV-positive, and Brown passed this information on to Pettit at some point before Runnebaum was fired.[13] In addition, Runneb-aum ordered a prescription for the drug azi-dothymidine (AZT) through the bank health plan, and packages of AZT that were delivered to the bank were twice opened by bank personnel. Second, there is evidence that the reasons given for Runnebaum’s firing were pretextual. The following is a brief summary of such evidence.
• When Runnebaum first came to Nati-onsBank, he worked in the private banking department. When he applied for a position in the trust department, bank policy dictated that he could only be considered for the transfer if he was “performing at a satisfactory level or above in [his] current position.” J.A. 276. Runnebaum’s supervisor certified that his performance met this requirement, stating that he had “good skills and is a valuable member of the PB [private banking] team.” J.A. 276.
• Ann Pettit claims that she made the decision to fire Runnebaum in early November 1992. However, she made no record of this decision, nor did she counsel Runnebaum that his job was in serious jeopardy. After she supposedly made this decision, she placed Run-nebaum in charge of planning and hosting the major marketing event of the year, NationsBank’s “Greater Baltimore Holiday Reception,” which had a $10,000 budget and involved over 400 clients, potential clients, and those who could refer clients. Additionally, she sent Runnebaum a note on December 9 that said: “William — I’m thrilled that you’re a part of our group. I look forward to seeing you shine.” J.A. 431.
• In a January 7, 1993, memorandum written by Pettit describing the reasons for Runnebaum’s firing, she claims that he failed to attend a sufficient number of “prospect” sales calls. However, Runnebaum was denied credit for calls he made with Brown and Sara Tapiero, a portfolio manager, as well as those he made alone. He was even denied credit for three calls (he made alone) that resulted in actual sales. Another employee in the same sales position as Runnebaum, Clifford Andersson, was given credit for calls he made with Brown and Tapiero, as well as those he made alone.
• Runnebaum had nearly $5 million in sales by the end of 1992, which brought $21,900 in fees to the bank. Although this fell short of the targeted $40,000 in fees, Andersson had the same target and only brought in $275,-000 in sales and $2,750 in fees. An-dersson was not fired. Andersson also shared Runnebaum’s alleged failure to submit timely activity and sales call reports. Pettit acknowledged that “both of them had slacked off’ early in their tenure. J.A. 371. She counseled both men, and the timeliness of their reports thereafter improved.
• Runnebaum also provided evidence to dispute the other reasons for his firing listed in Pettit’s January 7 memoran *188 dum. Pettit faulted Runnebaum for failing to attend any meetings of the Baltimore Estate Planning Council, but no meetings were scheduled during Runnebaum’s tenure in trusts. Pettit also said that Runnebaum failed to send copies of his correspondence to her, but all of Runnebaum’s correspondence went out over Brown’s signature and Runnebaum “feel[s] certain” that he told Pettit about this arrangement. J.A. 240. Regarding Pettit’s complaints about his allegedly inappropriate behavior, Brown recalled that Pet-tit’s initial reaction was that “he is young” and “he has got to learn that it is okay not to say anything.” J.A. 66. Additionally, it made no sense for Pet-tit to assign Runnebaum responsibility for an important public relations effort, the holiday reception, if she was concerned about how he would conduct himself.
In sum, Runnebaum has presented evidence that the bank knew of his HIV status, that the reasons given for his firing were pretextual, and that a senior bank officer was “panicky” and “uncontrolled” when he learned of Runnebaum’s HIV status. This evidence creates an issue of material fact as to whether Runnebaum was “regarded as” having a disability.
The majority’s analysis of the evidence on this issue is flawed in several respects. First, it understates the evidence that supports Runnebaum’s position. It ignores most of the circumstantial evidence and takes the “divide and conquer” approach to the rest, analyzing it in pieces rather than considering it as a whole. Second, it only finds Brown’s testimony relevant to show that the bank was aware of Runnebaum’s HIV status. However, Brown’s “panicky” reaction to Runneb-aum’s revelation shows that at least one bank officer may have regarded Runnebaum as disabled. Finally, and most inexplicably, the majority finds that Pettit definitely decided to fire Runnebaum on November 3, 1992. The majority talks about this finding as if it was uncontroverted fact. See ante at 174 (“Although Pettit knew that Runnebaum was HIV-positive when she discharged him, she did not possess this knowledge when she decided to fire him on November 3, 1992.” (emphasis in original)). The timing of Pet-tit’s decision, however, is sharply contested by the parties, and there' is considerable circumstantial evidence that she did not decide to fire him on November 3. More than two. months elapsed between her supposed date of decision and Runnebaum’s ultimate discharge. She never warned Runnebaum that his job was in serious jeopardy. Moreover, after she supposedly decided to fire Runnebaum, she immediately assigned him an important marketing project and she sent him a glowing note saying she was “thrilled” that he was part of her team. Although Pettit and Brown did testify that Pettit made the discharge decision on November 3, the majority never explains why their testimony must be believed when it is contradicted by Pettit’s own actions reflecting confidence in Runnebaum. The majority’s unquestioning acceptance of Pettit’s testimony cuts against the most basic principle of summary judgment: “all justifiable inferences are to be drawn in [the nonmovant’s] favor.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). The majority states this principle, see ante at 163, but then fails to follow it in this most important instance.
It may be that “the mere fact that an employer is aware of an employee’s impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action.” Kelly v. Drexel Univ., 94 F.3d 102, 109 (3d Cir.1996). Runnebaum presents much more, however, than mere evidence that NationsBank knew he was HIV positive. He presents strong circumstantial evidence that the reasons offered by the bank for his termination were pretextual, and he presents direct evidence that he was regarded as disabled. Although a jury could reasonably find against Runneb-aum, there is sufficient evidence here to create an issue of material fact.
III.
The majority’s determination that Runneb-aum does not have a disability would dispose *189 of the case. However, the majority does not limit itself to the series of holdings that make up its disability determination. It goes on to hold that Runnebaum did not meet the legitimate expectations of NationsBank, that Run-nebaum cannot raise a reasonable inference of unlawful discrimination, and that the bank articulated legitimate, non-discriminatory reasons for Runnebaum’s discharge, reasons Runnebaum failed to prove were pretextual. All of these additional holdings are based on the same premise: that Runnebaum “did not meet NationsBank’s legitimate expectations for his employment.” Ante at 174.
As I outline above in part III., Runnebaum presents significant evidence that he met Na-tionsBank’s legitimate expectations and that the reasons provided for his firing were pre-textual. Before Runnebaum transferred to the trust department, his supervisor in the private banking department certified that he was performing satisfactorily and was “a valuable member of the [private banking] team.” J.A. 276. While in trusts Runneb-aum made nearly $5 million in sales, bringing $21,900 in fees to the bank. Although these amounts fell short of the targets set by Pet-tit, Runnebaum did much better than An-dersson, who was not fired. Runnebaum also supervised two important NationsBank marketing events which went off well.[14] Concerning Runnebaum’s alleged failure to make the targeted number of sales calls, Runnebaum was denied credit for many of the sales calls he made, but Andersson received credit when he made similar calls. Runnebaum’s failure to attend any meetings of the Baltimore Estate Planning Council can be explained by his assertion that no such meetings were held during his tenure in trusts, and he explains his failure to send copies of his correspondence to Pettit by indicating that she knew his correspondence was reviewed by Brown. Finally, concerning his allegedly inappropriate behavior, Run-nebaum contends that his behavior was not out of line with the general tone of the office, which was “highly energized” and prone to “a lot of horseplay.” J.A. 569. It would also make little sense for Pettit to assign Runneb-aum responsibility for important marketing events if she was concerned about inappropriate behavior.
In order to survive summary judgment, Runnebaum must forecast evidence showing a genuine issue of material fact on the ultimate question of pretext and discrimination. See Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir.1993). He has done so. Runnebaum’s evidence, if believed at trial, supports reasonable “disbelief of the reasons put forward by the defendant” and “rejection of the defendant’s proffered reasons,” which would permit a reasonable finder of fact to “infer the ultimate fact of intentional discrimination.” St. Mary’s Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). I would therefore reverse the district court’s grant of summary judgment and remand for trial.[15]
IV.
When Congress was considering enacting civil rights legislation for those with disabilities, the Presidential Commission on the HIV Epidemic made the following plea:
Comprehensive Federal anti-discrimination legislation, which prohibits discrimination against persons with disabilities in the public and private sectors, including employment, housing, public accommodations, and participation in government programs should be enacted. All persons with symptomatic or asymptomatic HIV infection should be clearly included as persons with disabilities who are covered by the anti-discrimination protections of this legislation.
S.Rep. No. 101-116, at 19. It is apparent from the ADA’s voluminous legislative histo *190 ry that Congress thought the ADA accomplished this. It was not alone. President Bush “call[ed] on the Congress to get on with the job of passing a law — as embodied in the Americans with Disabilities Act — that prohibits discrimination against those with HIV and AIDS.” Remarks by President Bush to Business Leadership, March 29, 1990, reprinted, in 136 Cong. Rec. S9546 (daily ed. July 11, 1990). The subsequent regulations which define HIV to be a disability reinforce the scope of this consensus.
The majority’s decision amounts to an outright repeal of Congress’s effort through the ADA to fight discrimination against those with asymptomatic HIV. Again, I respectfully dissent.
Judges K.K. HALL, MURNAGHAN, ERVIN, and DIANA GRIBBON MOTZ join this dissent.

. The majority does not discuss the general rule set forth in Hormel and Singleton. It instead relies on the proposition that "we may affirm a district court's decision on different grounds than those employed by the district court.” Shafer v. Preston Memorial Hosp. Corp., 107 F.3d 274, 275 n. 1 (4th Cir.1997); see also Jackson v. Kimel, 992 F.2d 1318, 1322 (4th Cir.1993). There is no indication, however, in either Shafer or Jackson that the alternate grounds in those cases had been neglected or conceded before the district court.

. In responding to my point that it is not fair to decide Runnebaum's case against him on an issue that was conceded by his opponent on summaiy judgment, the majority ignores the realities of litigation. It says that Runnebaum "knew that he bore the burden of developing a summary judgment record in support of his contention that he was” disabled, ante at 165-66 n.4, and that "[tjhere simply are no more facts to be developed” on this issue, id. at 165 n. 4. Runneb-aum was the plaintiff, however, and he surely had access to facts about his own condition. If Runnebaum had facts at his disposal to offer evidence of disability at trial or to offer affidavits (if they became necessary) in summary judgment proceedings, there was no need for him to take discovery on his own disability. The majority, of course, suggests that there are no facts available to support an affidavit showing disability and says that even if there were, such facts could not trump deposition testimony already taken. These assertions do not take the whole picture into account. First, there is some evidence in the deposition excerpts we have that the HIV *179 virus had begun to attack Runnebaum’s immune system. See post at 180 n.3 & 183 n.9. Second, we do not have access to all of the discovery that was taken. We only have deposition excerpts and documents that relate to the issues raised on summary judgment. Thus, we have no way of knowing if there is anything else in unfiled discovery material that bears on disability. Finally, we do not know what facts Runnebaum could present on disability if he had the chance. At bottom, I cannot understand why the majority insists on deciding an issue that the parties have not yet litigated, especially when it is not necessary to the disposition of this appeal.

. There is evidence that Runnebaum experienced this syndrome. See J.A. 152 (testimony of Dr. Michael Pistole, Runnebaum’s physician) (“[Run-nebaum] had had this syndrome a couple of years before, which I almost think — when you become HIV positive — that what happens is that you go through a viral-like syndrome and it can last for months, or weeks to months, and be very bad. It can be like — I’m just wondering if in 1986 that was the prodrome of HIV infection.").

. The majority argues that if the effects of HIV can constitute an "impairment” under the ADA, then the ADA will soon extend to cover those diseases that "lurk in the genes, and perhaps the futures, of millions of apparently healthy people.” Ante at 168 n. 6. If a disease or condition merely "lurks” in one's genes or in one’s future, it has no immediate health effect and therefore would not be considered an impairment. On the other hand, as soon as the HIV infection is contracted, it begins the process of causing serious damage to the immune system.

. We need not reach the issue of whether the contagiousness of HIV is sufficient on its own to constitute an impairment. In Doe v. University of Maryland Med. Sys. Corp., 50 F.3d 1261 (4th Cir.1995), however, we found that the potential for HIV transmission disqualified an HIV infected individual from serving as a surgeon. See id. at 1266 ("We hold that Dr. Doe does pose a significant risk to the health and safety of his patients that cannot be eliminated by reasonable accommodation.").

. The majority argues that the reports’ failure to differentiate between symptomatic and asymptomatic HIV means that Congress did not determine whether asymptomatic HIV was an impairment. I believe, however, that Congress’s failure to differentiate counsels against the majority’s interpretation, not for it. In other words, Congress purposely declined to differentiate because it wanted no differentiation to be made.

. Section 12102 is located immediately before subchapter I, which begins at § 12111. Thus, the definition of "disability” provided in § 12102(2)(A) is not specific to the employment subchapter; it instead applies to the whole ADA. In Ennis the court expressed uncertainty as to whether the EEOC had the authority to promulgate a regulation concerning the definition of "disability” provided in § 12102(2)(A) or any of the terms within that definition (such as "impairment”) since § 12102(2)(A) is not located within subchapter I. See Ennis, 53 F.3d at 60 n. 4. Because Congress delegated to the EEOC the authority to issue regulations for the employment subchapter, I believe it reasonable to assume that Congress intended for the EEOC to define impairment in cases, such as this one, brought under the employment subchapter. See 42 U.S.C. § 12116 (directing the EEOC to issue regulations in order to "carry out this subchap-ter”).
If 42 U.S.C. § 12116 can be considered a direct grant of congressional authority to define impairment in the employment context, then the EEOC's definition must be given "controlling weight” if the statute is otherwise ambiguous. See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Even if Congress did not grant the EEOC direct statutory authority to define impairment, however, we still must defer to the EEOC’s regulations if they are a "reasonable interpretation” of the statute. See id. (requiring deference to a reasonable interpretation if the legislative delegation to an agency is "implicit rather than explicit”).

. Other agencies have been even clearer by directly including HIV infection in their interpretation of "impairment.” See 28 C.F.R. § 35.104 (Department of Justice) ("The phrase physical or mental impairment includes ... HIV disease (whether symptomatic or asymptomatic)...."); 28 C.F.R. § 36.104 (Department of Justice) (same); 29 C.F.R. § 34.2 (Department of Labor) (same); 34 C.F.R. § 1200.103 (National Council on Disability) (same); 7 C.F.R. § 15e.l03 (Department of Agriculture) (same); 5 C.F.R. § 1636.103 (Federal Retirement Thrift Investment Board) (same); 22 C.F.R. § 1701.103 (Institute of Peace) (same); 45 C.F.R. § 2301.103 (Arctic Research Commission) (same); 24 C.F.R. Ch. I, Subch. A, App. I § 100.201 (Department of Housing and Urban Development) (adding HIV infection to list of physical and mental impairments).

. Moreover, Dr. Pistole makes clear that he has provided "aggressive treatment” of Runneb-aum's HIV infection through the use of "chain breaker type drugs.” J.A. 155. In Hants v. H & W Contracting Co., 102 F.3d 516 (11th Cir.1996), the court held that the determination of whether a person is disabled must be made "without regard to mitigating measures such as medicines.” Id. at 520 (quoting 29 C.F.R. pt. 1630, app. § 1630.2(j)). Runnebaum’s condition would likely be far worse if he was not taking the medication prescribed by Dr. Pistole. There is also evidence that the medication took its own toll on Runnebaum. See J.A. 84 (testimony of Runnebaum) ("[T]here were days that I felt very, very up and there were other days that I didn’t feel very good at all. That’s the effect of the drugs.”).

.The majority attempts to characterize some of my frank, step-by-step analysis as concession. See ante at 166-67. In the end, however, the grim and disabling nature of asymptomatic HIV is undeniable.

. The majority goes to great pains to try to distinguish the Kmiec Memorandum. See ante at 171-172. In support of its position, the majority quotes the memorandum as stating "there is nothing inherent in the [HIV] infection which actually prevents either procreation or intimate relations.” Ante at 171 (quoting Kmiec Memorandum at 405:7). The majority takes this quotation out of context, however, and thereby distorts its meaning. The actual sentence is: “Thus, it might be asserted that there is nothing inherent in the infection which actually prevents either procreation or intimate relations.” Kmiec Memorandum at 405:7. This sentence is followed by a footnote, which states: "As indicated in the text, we think this argument is disingenuous at least insofar as infection physically precludes the normal procreation of healthy children.” Id. at 405:7 n. 13.

. The Abbott court noted that a pregnant woman with HIV stands an 8% chance of viral transmission to her child if she was taking the drug azidothymidine (AZT) and a 25% chance of transmission if not taking AZT. Abbott, 107 F.3d at 942. Although the court did not specify the source of this information, it presumably was based on evidence in the case. Since Nations-Bank did not contest disability, we have no evidence in this case as to the risk of transmission from a man to his child or his sexual partner.

. It is unclear when Brown told this to Pettit. Pettit believes it was ‘‘[p]robably towards the end of November," J.A. 317, and Brown thinks that he told her at an early December meeting with Philip Cawley, NationsBank's personnel manager. However, Cawley is emphatic that this information was not discussed at the December meeting.

. In addition to the "Greater Baltimore Holiday Reception” discussed above, Runnebaum planned a reception for McGuire, Woods, Battle & Boothe, a law firm that could refer trust business to the bank. After the latter reception Brown sent Runnebaum a handwritten "note of thanks and congratulations” for handling the event. J.A. 432.

. Since, as the majority says, "[a]s goes Run-nebaum’s ADA claim, so goes his ERISA claim,” ante at 175, I would also reverse the grant of summary judgment to the bank on the ERISA claim.